# United States Court of Appeals
## For the First Circuit

No. 09-1636

WILLIAM MOSHER, INDIVIDUALLY AND AS ADMINISTRATOR
OF THE ESTATE OF WILLIAM MOSHER, JR.; CAROLYN MOSHER,
BRANDON MOSHER; KACIE MOSHER; KORTNEY MOSHER,

Plaintiffs, Appellants,

v.

KENNETH NELSON, INDIVIDUALLY AND AS SUPERINTENDENT
OF BRIDGEWATER STATE HOSPITAL; ELIZABETH CHILDS,
INDIVIDUALLY AND AS COMMISSIONER OF THE COMMONWEALTH OF
MASSACHUSETTS DEPARTMENT OF MENTAL HEALTH; KATHLEEN M. DENNEHY,
INDIVIDUALLY AND AS COMMISSIONER OF THE COMMONWEALTH OF
MASSACHUSETTS DEPARTMENT OF CORRECTION, BRIDGEWATER STATE
HOSPITAL; THE COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF MENTAL
HEALTH; COMMISSIONER OF THE COMMONWEALTH OF MASSACHUSETTS; THE
COMMONWEALTH OF MASSACHUSETTS DEPARTMENT OF CORRECTIONS;
UNIVERSITY OF MASSACHUSETTS MEDICAL SCHOOL,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Mark L. Wolf, U.S. District Judge]

Before

Lynch, Chief Judge,
Stahl, Circuit Judge,
and DiClerico,[*] District Judge.

[*]Of the District of New Hampshire, sitting by designation.

———————————

Jerrold N. Arnowitz, with whom Arnowitz, Goldberg, and Mann, LLC, was on brief for appellees.

Daniel G. Cromack, Assistant Attorney General, with whom Martha Coakley, Attorney General, and Ronald F. Kehoe, Assistant Attorney General, were on brief for appellees.

———————————

December 17, 2009

———————————

**DICLERICO, District Judge**. Following the death of their son at Bridgewater State Hospital ("BSH"), William and Carolyn Mosher ("the Moshers") brought a civil rights action, with related state law claims, against Kenneth Nelson, Superintendent of BSH; Kathleen Dennehy, Commissioner of the Department of Corrections; and Elizabeth Childs, Commissioner of the Department of Mental Health.[1]  The district court granted summary judgment for the defendants.  The Moshers appeal.  For the reasons that follow, we affirm the judgment of the district court.

I.

BSH is a facility, operated by the Massachusetts Department of Corrections, that serves as both a prison and a mental hospital.  Most of the patients at BSH have histories of violence in addition to mental illness.  Kenneth Nelson served as Superintendent of BSH from 1994 until April of 2007.  As Commissioner of the Department of Corrections, Kathleen Dennehy was the chief executive officer of the department, but she did not have any direct supervisory role at BSH.  Nelson, instead, reported to an assistant deputy commissioner in the Department of Corrections. Elizabeth Childs, who was Commissioner of the Department of Mental

---

[1]Other claims and parties were dismissed from the case, and these dismissals have not been appealed.

-3-

Health, had no role at BSH except to approve the appointment of a medical director at that facility.[2]

The Moshers' son, William Mosher, Jr., was a pretrial detainee at the Middlesex County jail in July of 2004, when he was sent to BSH for a thirty-day observation period. After he assaulted a nurse, Mosher was held in the Intensive Treatment Unit at BSH until he was moved to Max 2, one of the maximum security units. His observation period was extended from thirty days to six months.

In 2004, Max 2 was located in a secure stand-alone building that included individual patient rooms and common areas. Patients in Max 2 were not allowed to stay in their rooms during the day, except during patient count, because the rooms could shield patients from the observation of the staff, leading to a concern about suicide. An exception to that rule was a long-standing practice that allowed patients to remain in their rooms and visit in other patients' rooms for a short period from the end of the morning count, at approximately 11:15 a.m., until lunch. On August 28, 2004, during the period between the end of the morning count and lunch, William Mosher, Jr. went into the room of his neighbor, Bradley Burns. While Mosher was there, Burns strangled him to death with a tee shirt. No one previously had been killed

---

[2]The Moshers do not appeal summary judgment that was granted on their claims against Childs.

at BSH, and no prior violent incidents had been reported to have occurred during the visiting period between the end of morning count and lunch. After Mosher's death, BSH ended the visiting practice. At the time Burns killed Mosher, Nelson did not know who Burns was, although he was aware of Mosher because of his prior attack on a nurse.

William and Carolyn Mosher brought claims under 42 U.S.C. § 1983 against the defendants in their individual capacities, alleging that the defendants' conduct constituted cruel and unusual punishment of their son, resulting in his death, and that the defendants conspired to perpetuate the challenged conditions of confinement. The Moshers also alleged conspiracies to deprive their son of constitutional rights under 42 U.S.C. § 1985 and 42 U.S.C. § 1986. They further alleged state law claims for damages against the defendants in their official capacities. The district court granted the defendants' motion for summary judgment, concluding that the evidence was insufficient to prove the Moshers' constitutional claims, that the defendants were entitled to qualified immunity on the constitutional claims, and that the state law claims were barred by the Eleventh Amendment. The Moshers appeal the summary judgment decision.

II.

On appeal, the court reviews the district court's decision granting summary judgment under the de novo standard. Sullivan v. City of Springfield, 561 F.3d 7, 14 (1st Cir. 2009).

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the record. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A party opposing a properly supported motion for summary judgment must present competent evidence of record that shows a genuine issue for trial. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986). All reasonable inferences and all credibility issues are resolved in favor of the nonmoving party. See id. at 255.

III.

The Moshers argue that summary judgment was not appropriate because a factual dispute exists as to whether Nelson knew of and disregarded the substantial danger to patients in Max 2 during the morning visiting period and whether Dennehy ignored complaints about insufficient staffing and security at BSH. The Moshers also argue that Nelson and Dennehy were not entitled to

-6-

qualified immunity and that Eleventh Amendment immunity does not apply because their state law claims could be construed to arise under Title II of the Americans with Disabilities Act.  The defendants argue in support of the district court's decision on the civil rights claims and the application of the Eleventh Amendment to the Moshers' state law claims.  We begin with a consideration of qualified immunity, which resolves the Moshers' civil rights claims.

A.  Qualified Immunity

"Qualified immunity is a judge-made construct that broadly protects public officials from the threat of litigation arising out of their performance of discretionary functions." Bergeron v. Cabral, 560 F.3d 1, 5 (1st Cir. 2009).  The qualified immunity analysis generally follows a two-step process of deciding "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009).  Recently, the Supreme Court gave courts discretion to address the "clearly established" step without first determining whether a constitutional right had been violated.  Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808, 818-19 (2009).  In the exercise of our discretion, we will use that procedure in this case.

The "clearly established" step is itself composed of two parts, which require the court to decide (1) whether "the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right," and (2) whether in the specific context of the case, "a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." Maldonado, 568 F.3d at 269 (internal quotation marks omitted). The first part addresses the status of the law at the time of the event in question, focusing on the clarity of the standard with respect to the asserted constitutional right. Id. The second part addresses the specific factual context of the case to determine whether a reasonable official in the defendant's place would have understood that his conduct violated the asserted constitutional right. Id. To be liable, an official must be on notice that his conduct violates established law. Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## 1. Status of the Law

Clearly established law does not depend on identical circumstances repeating themselves. Instead, notable factual differences may exist between prior cases and the circumstances at hand as long as the state of the law at the time gave the defendant "fair warning" that his action or inaction was unconstitutional. Id.; accord Safford Unified Sch. Dist. No. 1 v. Redding, ___ U.S. ___, 129 S. Ct. 2633, 2643 (2009). In an area of the law that is

-8-

continuing to evolve, there will be a range extending from an established core to outer boundaries where there is not clearly established law. See DeMayo v. Nugent, 517 F.3d 11, 18 (1st Cir. 2008). "The law is considered clearly established either if courts have previously ruled that materially similar conduct was unconstitutional, or if a general constitutional rule already identified in the decisional law applies with obvious clarity to the specific conduct at issue." Guillemard-Ginorio v. Contreras-Gomez, 585 F.3d 508, 527 (1st Cir. 2009) (internal quotation marks omitted).

The Supreme Court has established a general constitutional standard that "[a] prison official's 'deliberate indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment."[3] Farmer v. Brennan, 511 U.S. 825, 828 (1994); accord Calderón-Ortiz v. LaBoy-Alvarado, 300 F.3d 60, 63-64 (1st Cir. 2002) ("An inmate may sue a correctional facility under the Eighth Amendment for failure to afford adequate protection to inmates from attack by other inmates."). Prison officials have a constitutional duty "not to be deliberately indifferent to the risk to prisoners of violence at the hands of other prisoners." Burrell v. Hampshire County, 307 F.3d 1, 7 (1st

---

[3]"Pretrial detainees are protected under the Fourteenth Amendment Due Process Clause rather than the Eighth Amendment; however, the standard to be applied is the same as that used in Eighth Amendment cases." Burrell, 307 F.3d at 7.

-9-

Cir. 2002). Therefore, in August of 2004, when the events giving rise to this case occurred, the law was clearly established that a detainee had a constitutional right not to be punished until convicted of the charges against him and that a corrections official would violate the Fourteenth Amendment if he were deliberately indifferent to a substantial risk of serious harm to a detainee, including violence inflicted by one detainee upon another detainee.

In 2004, deliberate indifference, in the constitutional context, meant that a "prison official subjectively 'must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference.'" Id. at 8 (quoting Farmer, 511 U.S. at 837). That standard, which has remained in effect up to the present time, requires "something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result" but "something more than mere negligence." Farmer, 511 U.S. at 835. After the standard was announced in Farmer and before August of 2004, we addressed the level of culpability required to meet the deliberate indifference standard in the context of prisoners inflicting violence on other prisoners.

We considered First Circuit precedent addressing deliberate indifference to inmate violence in Burrell. 307 F.3d at 9. There, we noted that we vacated summary judgment in the

-10-

defendants' favor in Giroux v. Somerset County, 178 F.3d 28 (1st Cir. 1999), where "jail officials inexplicably introduced a person posing a known danger, another inmate who had repeatedly threatened Giroux, into the holding cell where Giroux was being kept." Burrell, 307 F.3d at 9. The jail officials took that action although they appeared to know that their own actions "would tar Giroux as an informant and thereby increase the risk to him." Id. In Calderón-Ortiz, we concluded that the plaintiff sufficiently alleged deliberate indifference to avoid dismissal where inmates were not classified, leaving more dangerous inmates with vulnerable inmates and where "prison officials failed to make their regular patrols of the housing areas, allowing a violent attack to go on for between half an hour and an hour." Burrell, 307 F.3d at 9.

In contrast, we concluded that the record in Burrell did not sufficiently show deliberate indifference to avoid summary judgment because the officials responded reasonably to the risk that was known to them at the time. Id. at 8. There, Burrell and his wife complained to prison officials about problems with an inmate who later attacked Burrell. We concluded that the officials were not indifferent and instead acted reasonably in not providing additional protection for Burrell because they knew he was highly trained in self defense and martial arts, neither Burrell nor his wife requested protective custody, no history existed of violence

between Burrell and the inmate who attacked him, and the officials believed Burrell could and would protect himself.

With the standard in mind, we next consider whether a reasonable official in Nelson's position would have been on notice, given the state of the law in 2004, that his conduct violated the Fourteenth Amendment.

### 2.  Standard in Factual Context

#### a.  Nelson

In this case, Nelson was aware of the dangers associated with the BSH patients generally and the patients housed in Max 2. He was aware of the security rule that the patients in Max 2 were not allowed to stay in their rooms except during the count because of the risk of harm, in particular the risk of suicide, when patients were out of view of the staff.[4]  Nelson was also aware that, despite the security rule, a long-standing practice existed which allowed patients to stay in their rooms and to visit in each

_____

[4]The Moshers raise a new argument on appeal, contending that Nelson violated the Phase Treatment Program at BSH by allowing the patients to stay in their rooms and visit in other rooms during the period between the morning count and lunch.  They contend that Nelson's disregard of the Phase Treatment Program is further evidence of his deliberate indifference to the substantial risk of serious harm related to that practice.  Because the Moshers failed to raise that theory below, it is waived here. See, e.g., In re Pharm. Indus. Average Wholesale Price Litig., 582 F.3d 156, 183 (1st Cir. 2009). The exceptions to waiver do not apply in the circumstances of this case. Cf. Guillemard-Ginorio, 585 F.3d at 517 (reaching abstention issue despite possible waiver).  Even if the Moshers' Phase Treatment Program theory were considered, however, it would not change the outcome.

others' rooms during the short period between the end of morning count and lunch. When patients were in their rooms or in other patients' rooms they were subject to reduced supervision because they could be out of the view and earshot of the staff. Although the visiting practice had been long-standing, no problems or incidents related to the practice had been reported to Nelson. In addition, Nelson had no specific information about Burns, nor any reason to suspect that Burns might attack Mosher, nor any reason to believe that Mosher was particularly vulnerable to attack.[5]

For purposes of qualified immunity, we must decide, given the state of the law in 2004, whether a reasonable official in Nelson's position, with his knowledge of the circumstances that existed in Max 2 when Burns killed Mosher, would have understood that the practice of allowing patients to visit in other patients' rooms following morning count presented a substantial risk of serious harm to the patients. The district court concluded that, given the circumstances in Burrell, the law was not clearly established that failure to change the visiting practice would constitute a violation of Mosher's constitutional rights. The district court held that Nelson was entitled to qualified immunity.

---

[5]Specific information and warnings about inmates are components of the overall circumstances that contribute to a determination of deliberate indifference. See, e.g., Giroux, 178 F.3d at 34.

-13-

We agree. No case had held that the same circumstances that occurred at BSH or materially similar circumstances constituted a Fourteenth Amendment violation. In addition, the cases addressing a detainee's right to be free of punishment before conviction did not clearly apply to the circumstances that existed in Max 2 in August of 2004.

It was not clearly established law that in the absence of a history of violence or individualized threats, a prison official's failure to discontinue a long practice of a brief period of unsupervised visits was deliberate indifference to a substantial risk of harm to a patient. A reasonable official in Nelson's place, given the circumstances and the legal standard, could have believed that allowing the practice to continue would not lead to events that would violate a patient's rights. Therefore, Nelson is entitled to qualified immunity.

b. <u>Dennehy</u>

The Moshers contend that Commissioner Dennehy violated their son's Fourteenth Amendment due process rights by supervisory acquiescence and gross negligence in understaffing the Max 2 unit at BSH. The Moshers contend BSH was understaffed in 2004, when their son was murdered, that the Max 2 unit should have had five or six officers, and that understaffing was a system-wide problem for the Department of Corrections. At the time of the murder, however,

-14-

the BSH staffing analysis required three officers in Max 2, and four officers were on duty.

Without accepting the proposition that understaffing alone can establish deliberate indifference, on the facts here, a reasonable official in Dennehy's position could have reasonably believed that staffing that met the BSH recommendations was sufficient to avoid constitutional violations. Therefore, Dennehy is entitled to qualified immunity.

B.  Eleventh Amendment Immunity

The district court granted summary judgment for the defendants on the Moshers' state law claims, holding that the claims are barred by the Eleventh Amendment. On appeal, the Moshers contend that Eleventh Amendment immunity is not available to the state because their claims assert violations of the constitutional rights of a person protected by the Americans with Disabilities Act ("ADA").[6] The Moshers acknowledge that they did not bring a claim under the ADA in the district court but contend that their new theory is sufficiently important to be considered despite their omission. The defendants object that the Moshers waived their new ADA claim by failing to allege it in their

---

[6]The Moshers' citation to 42 U.S.C. § 1213 is incorrect. 42 U.S.C. § 12131 provides certain definitions used in the ADA while § 12132 prohibits discrimination against qualified individuals based on a disability. It is unclear what statute the Moshers intended as the basis for their claim.

complaint or in the proceedings below and argue that the Eleventh Amendment bars the Moshers' state law claims.

As the defendants point out, the Moshers waived the ADA claim and their new theory based on the ADA by failing to raise either theory in the district court. In addition, even if the claims were not waived, the Moshers' state law claims, brought against the defendants in their official capacities, were for wrongful death, negligence, gross negligence, infliction of emotional distress, loss of consortium, and strict liability. Contrary to the Moshers' new theory, they did not allege constitutional violations as part of their state law claims nor did they allege violations of the ADA.

The district court properly dismissed the Moshers' state law claims as barred by the Eleventh Amendment.

IV.

For the foregoing reasons, summary judgment for the defendants is **affirmed.**