# United States Court of Appeals

## For the First Circuit

No. 10-1242

ELLEN H. DECOTIIS,

Plaintiff, Appellant,

v.

LORI WHITTEMORE, individually and in her official capacity as
Director of Child Development Services—Cumberland; CHILD
DEVELOPMENT SERVICES-CUMBERLAND; DEBRA HANNIGAN, State Director
of Child Development Services,

Defendants, Appellees.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MAINE

[Hon. George Z. Singal, U.S. District Judge]

Before

Torruella and Lipez, Circuit Judges,
and Smith,[*] District Judge.

Rufus E. Brown, with whom Brown & Burke, Zachary L. Heiden,
and MCLU Foundation, were on brief for appellant.
Sarah A. Forster, Assistant Attorney General, with whom Janet
T. Mills, Attorney General, and Paul Stern, Deputy Attorney
General, were on brief for appellees.

March 24, 2011

[*] Of the District of Rhode Island, sitting by designation.

**SMITH**, <u>District Judge</u>.  In this case we must consider the First Amendment rights of a speech and language therapist working as a state contractor.[1]  Navigating the shoals of the standard articulated by the Supreme Court in <u>Garcetti</u> v. <u>Ceballos</u>, 547 U.S. 410 (2006), has proven to be tricky business, and particularly so in the context of a motion to dismiss, because the inquiry is so highly fact intensive and context specific.

Plaintiff Ellen H. Decotiis brought suit against Child Development Services-Cumberland County ("CDS-Cumberland"), Lori Whittemore individually and in her official capacity as Director of CDS-Cumberland, and Debra Hannigan in her official capacity as State Director of Child Development Services ("CDS") (collectively the "Defendants") pursuant to 42 U.S.C. § 1983.  Decotiis alleges that she was retaliated against in violation of her First Amendment free speech rights for expressing her opinion to parents that CDS-Cumberland was not in compliance with state regulations and urging parents to contact advocacy organizations to address this problem. She seeks a declaration that the non-renewal of her CDS-Cumberland contract was a violation of her First Amendment rights, injunctive

---

[1] Though we recognize that Plaintiff is a government contractor, for ease of reference, we generally refer to "government employees" or "public employees" throughout our discussion of First Amendment principles, noting explicitly where Plaintiff's status as a government contractor affects the analysis. <u>See</u> <u>Bd. of Cnty. Comm'rs</u> v. <u>Umbehr</u>, 518 U.S. 668, 678 (1996) (noting that the existing First Amendment framework for government-employee speech can accommodate differences between government employees and contractors).

relief to reinstate her contract and to prevent future retaliation based on protected speech, and attorney's fees. She also seeks compensatory and punitive damages from Whittemore, and compensatory damages from CDS-Cumberland.

The district court dismissed the complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. On appeal Decotiis argues that the district court erred in holding that her speech was not protected by the First Amendment under the principle enunciated in Garcetti and in holding that Whittemore is entitled to qualified immunity. We affirm the district court's judgment dismissing the complaint against Whittemore, because she is entitled to qualified immunity in her individual capacity and the suit against Whittemore in her official capacity is redundant of the suit against CDS-Cumberland. However, we conclude that the complaint sufficiently alleges a constitutional violation, particularly in light of two holdings of this Court that came after the district court's ruling and limned the contours of the Garcetti doctrine. We therefore vacate the judgment dismissing the complaint against Hannigan and CDS-Cumberland, and remand for proceedings consistent with this opinion.

## I.

On review of a grant of a motion to dismiss, we state the facts as set forth in the complaint, drawing all reasonable inferences in favor of the plaintiff, the non-moving party.

Cunningham v. Nat'l City Bank, 588 F.3d 49, 51 (1st Cir. 2009).

CDS is a system of intermediate educational units[2] created under state and federal law to provide early intervention and special education services under the Individuals with Disabilities Education Act ("IDEA") for children with disabilities from birth to five years old. It is supervised by the Maine Department of Education. At the time the complaint was filed, fifteen regional sites, including CDS-Cumberland, comprised the system. Defendant Whittemore is the director of CDS-Cumberland and is alleged to be personally responsible for the retaliation against Decotiis. Defendant Hannigan is the state director of CDS.

Decotiis is a speech and language therapist licensed by the state of Maine who over the previous eighteen years, and at the time of the events giving rise to this action, had contracts with various regional CDS sites to provide speech and language therapy and evaluations for children.

In May 2008, Chapter 101 of the Maine Unified Special Education Regulation ("Unified Rule 101") was adopted. Prior to its adoption, eligible children generally received services for the full calendar year, in accordance with their Individualized Family

---

[2] The term is not defined in the complaint, but "intermediate educational unit" is defined by the Education title of the Code of Federal Regulations as "any public authority, other than [a local education agency], that is under the general supervision of a State educational agency, that is established by State law for the purpose of providing free public education on a regional basis, and that provides special education and related services to children with disabilities within that State." 34 C.F.R. § 222.50.

Service Plans ("IFSP") or Individualized Education Plans ("IEP"). Unified Rule 101, however, limited these services for children aged three to five years old to the school year (September through June). As a result, services were not provided to children over the summer unless they were deemed eligible for extended school year services ("ESY services"). In response to this new regulation, the state CDS adopted a policy offering ESY services as "the exception and not the rule." (Compl. ¶ 22.) That is, ESY services were to be provided only when a child's IEP team decided that the services were necessary to give the child a free and appropriate public education under IDEA. According to the complaint, Unified Rule 101 and CDS's new policy generated a stir; the CDS regional sites, service providers, and parents of children with disabilities throughout Maine were confused and concerned. This concern stemmed particularly from the absence of a clear procedure outlining the objective standards that would support eligibility determinations for ESY services.

In the spring of 2008, Decotiis was working under contracts with three regional CDS sites, including CDS-Cumberland, to provide speech and language services to children. It was around this time that Whittemore, case managers at CDS-Cumberland, and parents of children served by CDS-Cumberland informed Decotiis about CDS-Cumberland's approach to ESY-service determinations. Specifically, Decotiis was told that it was unlikely that children

would receive ESY services unless they were considered severely disabled, and that children who received a single service (for example, only speech therapy) would not qualify for ESY services. Moreover, Decotiis was told that eligibility determinations were being made without the benefit of IEP meetings and that IEP meetings discussing children's eligibility for ESY services were only held at the insistence of parents. Decotiis also learned that Whittemore no longer trusted her clinical judgment as a result of what Whittemore perceived to be Decotiis's high rate of ESY-service recommendations, and that Whittemore would no longer accept her recommendations. In contrast to the practices of CDS-Cumberland, at the other two regional CDS sites for which Decotiis worked, Decotiis submitted quarterly reports for her caseload, including her recommendations for ESY services; she would then be notified of IEP meetings; and at these meetings, the team would review her recommendations and make decisions about ESY services.

After learning about CDS-Cumberland's approach to ESY services, Decotiis approached Hannigan about the discrepancy between the practices of the different regional sites. Hannigan responded that she had no insight into these differences. Subsequently, Decotiis contacted two advocacy groups in Maine, which advised her that CDS-Cumberland did not appear to be in compliance with state and federal law.

Shortly thereafter, Decotiis "informed parents of

-6-

children she was treating that she was confused and concerned about the criteria CDS-Cumberland was using for eligibility for [ESY] services and that parents should contact [advocacy organizations] for guidance concerning their rights under IDEA." (Id. ¶ 42.) She also posted a notice in her office with the names and telephone numbers of the advocacy organizations for the benefit of parents, because she believed that CDS-Cumberland had given parents the incorrect number for one of the organizations.

In a letter dated July 29, 2008, CDS-Cumberland informed Decotiis that her contract, due to expire on September 1, 2008, would not be renewed.[3] As of August 7, 2009, the date of the complaint, Decotiis was still working under contract at two other regional CDS sites.[4] Defendants moved to dismiss the complaint. The district court granted that motion, without a hearing, on January 28, 2010. Decotiis now appeals.

## II.

We review de novo the district court's dismissal under Rule 12(b)(6). Cook v. Gates, 528 F.3d 42, 48 (1st Cir. 2008).

[3] Though Decotiis refers to the termination of her employment in some paragraphs of her complaint, it appears clear on appeal that the alleged retaliatory action was in fact the non-renewal of her contract with CDS-Cumberland.

[4] Decotiis alleges additional facts in the complaint supporting her claim that the non-renewal of her contract was in retaliation for her speech. These facts have been omitted because they are not relevant to our discussion here. See infra note 7 (noting that Defendants do not contend that Plaintiff inadequately pled retaliation).

The Court is not "wedded to the lower court's rationale" and may affirm the district court's order of dismissal "on any ground made manifest by the record." Roman-Cancel v. United States, 613 F.3d 37, 41 (1st Cir. 2010).

On a motion to dismiss, "we accept as true all well-pleaded facts in the complaint and draw all reasonable inferences in favor of the plaintiff[]." Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). The Federal Rules of Civil Procedure require a complaint to set forth "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To survive a motion to dismiss, this short, plain statement must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests," and allege "a plausible entitlement to relief." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 559 (2007). This plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009). Applying the plausibility standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

## A.   First Amendment Claim

Decotiis first argues on appeal that the district court erred in holding that she did not speak as a citizen. Though the

question is a close one, we agree that the district court erred in so holding, particularly when we consider our recent decisions interpreting Garcetti. Viewing the facts set forth in the complaint in the light most favorable to Decotiis, we conclude that she has alleged facts that form the basis of a plausible constitutional violation for which relief may be granted.

We begin with some fundamentals. Government employees undoubtedly walk a tight rope when it comes to speaking out on issues that touch upon their fields of work and expertise. It is well settled that "as a general matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out." Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 25-26 (1st Cir. 2010) (quoting Hartman v. Moore, 547 U.S. 250, 256 (2006)) (internal quotation marks and citations omitted). This right is not absolute, however; while public employees do not forfeit all of their First Amendment rights by undertaking public employment, "in recognition of the government's interest in running an effective workplace, the protection that public employees enjoy against speech-based reprisals is qualified." Id. at 26.

To determine whether an adverse employment action[5]

_____

[5] For purposes of a First Amendment retaliation claim, the non-renewal of an employee's contract constitutes an adverse employment action. See Barton v. Clancy, 632 F.3d 9, 26 (1st Cir. 2011) ("First Amendment protections apply with equal force whether the public employee is terminated from a position or not reappointed.").

-9-

against a public employee violates her First Amendment free speech rights, this Court has articulated a three-part inquiry. See Rodriquez-Garcia v. Miranda-Marin, 610 F.3d 756, 765-66 (1st Cir. 2010). First, a court must determine "'whether the employee spoke as a citizen on a matter of public concern.'" Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007) (quoting Garcetti, 547 U.S. at 418). Second, the court must "balance . . . the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id. at 44 (quoting Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968)) (omission in original). Third, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision." Id. at 45. If all three parts of the inquiry are resolved in favor of the plaintiff, the employer may still escape liability if it can show that "it would have reached the same decision even absent the protected conduct." Rodriquez-Garcia, 610 F.3d at 765-66 (citing Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)).

The Court must first determine whether the speech touched upon a matter of public concern.[6] Where speech relates to a matter of inherent public concern, such as official malfeasance or the neglect of duties, this inquiry is confined to the subject matter

---

[6] Defendants do not pursue this issue on appeal.

-10-

of the speech.  See Curran, 509 F.3d at 46; Jordan v. Carter, 428 F.3d 67, 73 (1st Cir. 2005).  Here, Decotiis informed the parents of children receiving speech and language services from CDS-Cumberland, the public agency charged with providing these services, that CDS-Cumberland may have been withholding certain services to which the children were legally entitled.  She also urged the parents to contact advocacy groups for guidance on the matter.  The subject matter of her speech plainly relates to a matter of inherent concern, and we therefore easily conclude that Decotiis's speech touched upon a matter of public concern. However, whether Decotiis was speaking as a citizen, and the merits of the Pickering balancing test, are up for debate.[7]

**1.  Garcetti Analysis**

In Garcetti, the Supreme Court held that public employees do not speak as citizens when they "make statements pursuant to their official duties," and that accordingly, such speech is not protected by the First Amendment.  547 U.S. at 421.  In Garcetti itself, there was no dispute about whether the speech in question had been made pursuant to the plaintiff's employment duties, and so the Court noted that it had "no occasion to articulate a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate."  Id. at

---

[7] We do not reach the issue of retaliation (i.e., whether the speech was a substantial or motivating factor in the adverse employment action), because Defendants do not allege that it was inadequately pled.

-11-

424. The Court did, however, provide some guidance as to how such a determination should be made. In describing speech made pursuant to employment duties, the Court included "speech that 'owes its existence to a public employee's professional responsibilities', speech that the employer 'has commissioned or created', speech that the employee 'was paid to' make, speech that the employee's 'duties . . . required him to' make, speech that amounts to the employee's 'work product', and speech that is an 'official communication[].'" Mercado-Berrios, 611 F.3d at 27 n.9 (quoting Garcetti, 547 U.S. at 421-23) (alteration and omission in original) (citations omitted).

At the time of the district court's order, this Court had not yet had occasion to consider the application of Garcetti, and particularly the question of what it means to speak "pursuant to" one's employment duties. We recently considered the application of Garcetti in two cases, Foley v. Town of Randolph, 598 F.3d 1 (1st Cir. 2010), and Mercado-Berrios, 611 F.3d 18, both of which inform the analysis.[8]

In Foley, the chief of the town's fire department brought a First Amendment retaliation claim alleging that the town and town officials suspended him for publicly criticizing the fire department's lack of funding and staffing during a press conference

---

[8] Foley was decided after the district court's decision now on review, but was discussed by the parties in their briefs to this Court. Mercado-Berrios was issued after briefing closed in this appeal.

he gave at the scene of a fatal fire. 598 F.3d at 2-4. In concluding that the fire chief's speech took on the character of an "official communication" rather than that of citizen speech, we stressed the importance of context in applying the Garcetti test, noting that it was not determinative that the plaintiff "was not required to speak to the media." Id. at 6-7 (emphasis in original). Specifically, we found three contextual factors significant: the fire chief "spoke while in uniform and on duty; he spoke from the scene of a fire where he had been in command as the Chief of the Fire Department; and his comments were bookended by those of another official — the State Fire Marshal." Id. at 8. The fire chief's speech was moreover "entirely related to matters concerning the Fire Department." Id. The combination of these contextual factors gave the appearance that the comments had the fire department's imprimatur and were not citizen speech. Id.

In Mercado-Berrios, we again considered the character of public employee speech. Mercado-Berrios was a transitory employee of the Puerto Rico Tourism Company, a public corporation charged with "regulating, investigating, overseeing, intervening and imposing sanctions" on persons providing tourism-related ground transportation in Puerto Rico. 611 F.3d at 20. After she and her colleagues were told to "hold your horses" and cease issuing citations to certain luxury vehicles, Mercado-Berrios complained to three other employees, two shift supervisors and an attorney. Id.

-13-

at 21.  Shortly thereafter, she applied for a permanent position but was passed over.  Id. at 21-22.  On the heels of this rejection, she brought suit alleging retaliation.  Id. at 22.

In Mercado-Berrios we emphasized the importance of the two-step, context-specific inquiry needed to determine whether speech is "made pursuant to the employee's official duties."  Id. at 26.  First, a court must ask, "what are the employee's official responsibilities?," and second, "was the speech at issue made pursuant to those responsibilities?"  Id.  After undertaking this two-part inquiry, we concluded that both sides had strong arguments and affirmed the district court's decision in Mercado-Berrios's favor because the defendant had failed to adequately brief the issue.  Id. at 27-28.

The instant case presents what may be a not uncommon scenario: a public employee who is hired to perform certain specific functions believes her employer is not complying with the law and suggests to constituents a method to exert pressure on the public agency to encourage compliance.  The question presented by such a case is: when does the public employee take off her employee hat and put on her citizen hat?

In identifying Plaintiff's official responsibilities, "the proper inquiry is 'practical' rather than formal, focusing on 'the duties an employee actually is expected to perform,'" and not merely those formally listed in the employee's job description.

<u>Id.</u> at 26 (quoting <u>Garcetti</u>, 547 U.S. at 424-25). It appears that the bulk of Decotiis's official duties related to evaluating and providing services to clients and participating in IFSP/IEP meetings.[9] Neither party argues that she was expected to perform duties substantially different from these formal job duties; however, Defendants argue that the job description presumed communication with parents.

Once the employment duties have been identified, the next question is: "was the speech at issue made pursuant to those responsibilities?" <u>Id.</u> at 26. Decotiis alleges retaliation for speech that occurred when she "informed parents of the children she was treating that she was confused and concerned about the criteria CDS-Cumberland was using for eligibility for [ESY] services and that parents should contact [advocacy groups] for guidance concerning their rights under the IDEA."[10] (Compl. ¶ 42.) To

_____

[9] The contract between Decotiis and CDS-Cumberland also required Decotiis to "comply with all applicable CDS policies communicated to the Contractor, as well as with Maine Department of Education Rules and Regulations, applicable Professional Standards of Practice, and any applicable State and/or Federal statute, rule or regulation, including but not limited to compliance with the Individuals with Disabilities Education Act (IDEA 2004), and the Americans with Disabilities Act (ADA)." (Contract at 3, Ex. B to Defs.' Reply Mem. in Supp. of Mot. to Dismiss.) It is reasonable for us to presume that the speech at issue was not made in an attempt to satisfy these obligations.

[10] The district court referred to a statement in Decotiis's complaint that she "posted information for advocacy groups in her office for the benefit of [her clients'] parents." <u>Decotiis</u> v. <u>Whittemore</u>, 680 F. Supp. 2d 263, 269 (D. Me. 2010) (quotation marks and citation omitted). The complaint does not, however, allege that Decotiis was retaliated against for this posting; rather, she

-15-

determine whether such speech was made pursuant to official responsibilities, the Court must take a hard look at the context of the speech. Foley, 598 F.3d at 7. Although no one contextual factor is dispositive, we believe several non-exclusive factors, gleaned from the case law, are instructive: whether the employee was commissioned or paid to make the speech in question, Garcetti, 547 U.S. at 421; the subject matter of the speech, id. at 421 (citing Givhan v. W. Line Consol. Sch. Dist., 439 U.S. 410, 414 (1979)); whether the speech was made up the chain of command, see id. at 420; whether the employee spoke at her place of employment, see Brammer-Hoelter v. Twin Peaks Charter Acad., 492 F.3d 1192, 1205 (10th Cir. 2007); whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it "official significance"), Foley, 598 F.3d at 7-8 & n.9; whether the employee's speech derived from special knowledge obtained during the course of her employment, see Williams v. Dallas Ind. Sch. Dist., 480 F.3d 689, 694 (5th Cir. 2007); and whether there is a so-called citizen analogue to the speech, Garcetti, 547 U.S. at 423.

Applying these factors, we identify some common ground between the parties: Decotiis was not literally authorized or

alleges retaliation for giving advice to parents. Accordingly, we limit our discussion to this allegation. The district court did correctly note, however, that Decotiis never asserts that she was retaliated against for reaching out to advocacy groups. Id. at 269 n.3. Therefore, like the district court, we do not include that in our analysis.

instructed to make the speech at issue. Indeed, the facts are quite the contrary; Decotiis's speech was "not made 'pursuant to' her job duties in the most literal sense." Mercado-Berrios, 611 F.3d at 27. Nothing in the complaint suggests that CDS-Cumberland authorized or commissioned Decotiis to urge parents to contact advocacy groups. Her speech may have been related to the subject matter of her job, but it was not, strictly speaking, among her enumerated duties to make such speech.[11] That being said, it is not determinative that an employee was not required to make the speech at issue. Foley, 598 F.3d at 6. An employee's job description is neither necessary nor sufficient to dictate the bounds of speech made pursuant to her employment duties. Garcetti, 547 U.S. at 425. By the same token, it is not dispositive that Decotiis's speech "concerned the subject matter of [her] employment." See id. at 420-21. Nothing in Garcetti or the decisions interpreting it can fairly be read to suggest that all speech tangentially or broadly relating to the work of a public employee is per se unprotected.

Beyond this, the analysis becomes more difficult, in part due to the posture of the case. Our review on a motion to dismiss is confined to the face of the complaint, and while Decotiis has stated facts sufficient to establish citizen speech, many other

_____

[11] Decotiis's speech also could not honestly be characterized as her "work product," as it was discussed in Garcetti. Whereas in Garcetti the speech at issue was a memorandum written by an attorney at the request of his supervisor, 547 U.S. at 414, the speech here was not of the sort Decotiis was expected to make in the course of delivering therapeutic services.

-17-

facts that would lend context to her speech are not available. For example, there is no indication where Decotiis advised her clients' parents. She may very well have been in her office (as the district court presumed); but viewing the facts in the light most favorable to Decotiis, she also could have spoken to parents in the grocery store on a Sunday afternoon, or from home on the telephone after hours, or at any sort of social event where people encounter one another in a small community.[12]

It is also not apparent from the complaint whether the speech was made during Plaintiff's work hours, or perhaps more relevantly, during a therapy session. Although the district court presumed "that the speech at issue here occurred during therapy sessions and/or evaluations conducted by the Plaintiff on behalf of CDS-Cumberland," Decotiis, 680 F. Supp. 2d at 269, we find no basis for this conclusion within the four corners of the complaint. Such facts may prove true as this litigation unfolds, but based only on the facts alleged in the complaint, such a presumption is

---

[12] This is not to imply that all speech made within one's office or workspace is necessarily unprotected. See Garcetti, 547 U.S. at 420 (citing Givhan, 439 U.S. at 414) ("Employees in some cases may receive First Amendment protection for expressions made at work."). Rather, it is only to point out that the more intertwined the speech is with the employee's work station the less likely it is that the speech is protected as citizen speech. Cf. Brammer-Hoelter, 492 F.3d at 1205 (holding that the teachers' speech was citizen speech because it occurred after hours and outside of the workplace, the teachers "had no supervisory responsibility and no duty to report with regard to any of the problems being discussed," and the discussion included members of the public).

inappropriate.

Furthermore, indulging all inferences in favor of Decotiis, we cannot conclude that her speech bore the appearance of official status or significance. The complaint states that she spoke to the parents of her clients, and it is true that speech made to an audience to which an employee only has access through her job is generally less akin to citizen speech.[13] See, e.g., Foley, 598 F.3d at 7 & n.9 (noting that the fact that the fire chief was "in uniform and on duty" at the time of the speech was not determinative but "relevant and important to the inquiry"); Tabb v. District of Columbia, 605 F. Supp. 2d 89, 95 (D.D.C. 2009)

_____

[13] In part because of Decotiis's audience, the district court and Defendants both analogize this case to Green v. Bd. of Cnty. Comm'rs, 472 F.3d 794 (10th Cir. 2007). In that case, a drug-laboratory technician, concerned that her laboratory did not have a confirmation-testing policy, arranged for an outside hospital to perform a confirmation test for a client who repeatedly advised the technician that she was not using drugs. Id. at 796. The outside test revealed a false positive, and her employer adopted a confirmation-testing policy in response. Id. Subsequently, the technician was subject to adverse employment action. Id. After considering many of the contextual factors we have delineated here, the Tenth Circuit concluded that the technician's speech was made pursuant to her employment duties because it "stemmed from and [was] the type of activit[y] that she was paid to do," and it reflected "the types of communications that would be attributable" to the laboratory, among other things. Id. at 800-01.
    Although this case is somewhat similar to Green the Tenth Circuit based its decision on material facts that are distinguishable from the facts alleged here — for example, it was clear that the technician was speaking in the laboratory, to clients, and even interacting with other agencies (the Department of Human Services and the outside hospital) in her capacity as an employee. Drawing all reasonable inferences in favor of Decotiis, as we must do at this stage of the litigation, the facts here are not truly analogous to Green.

("If plaintiff was generally responsible for presenting the public face of the agency . . . and if she expressly spoke in that capacity . . . then, under Garcetti . . . these statements likely are not protected."). However, the complaint does not suggest, for example, that parents were led to believe that Decotiis was speaking on behalf of CDS-Cumberland, or that Decotiis used her position of authority and trust, as the children's therapist, to lend her advice greater credence or persuasiveness. Therefore, drawing all reasonable inferences in Decotiis's favor, as we must, we conclude that Decotiis's speech did not create the appearance of CDS-Cumberland's approval or official significance.

Here, the complaint does not reveal whether Decotiis's speech was confined to information she had obtained through her employment, that is, whether her speech reflected "special knowledge" attributable to her work. See Williams, 480 F.3d at 694 (concluding that speech was not protected when the employee's knowledge was derived from his position, he spoke to other employees, and the speech concerned the subject matter of his employment). The complaint states that Unified Rule 101 and CDS's related policies had generated consternation among service providers and parents throughout the state. In light of this, it is reasonable to infer that such concern was the subject of public discussion and that Decotiis's knowledge was therefore publically available and not unique to her and those in her employment

-20-

position.[14]

Finally, we look to whether there is a so-called citizen analogue to Decotiis's speech. See Garcetti, 547 U.S. at 423 (holding that public-employee speech may be protected when it is "the kind of activity engaged in by citizens who do not work for the government"). Plaintiff argues that her speech was analogous to the speech of other citizens; she says that parents of children, advocacy groups, therapists, professional associations, and lawyers were all discussing the issues about which she spoke. Viewing the facts alleged in the complaint in the light most favorable to Decotiis, her speech appears to have been sufficiently analogous to the speech of other citizens in the community troubled by the new regulation and policy.

In short, while we cannot conclusively say that Plaintiff's speech was made as a citizen, the scope of our review on a motion to dismiss does not demand as much; it is sufficient that the complaint alleges facts that plausibly set forth citizen speech. See Sepulveda-Villarini v. Dep't. of Educ. of P.R., 628 F.3d 25, 30 (1st Cir. 2010) (Souter, J.) ("A plausible but inconclusive inference from pleaded facts will survive a motion to dismiss . . . ."). We conclude that Decotiis has surmounted this bar, and therefore the district court's dismissal for failure to

---

[14] Defendants argue that Decotiis's speech exploited not only special knowledge but also confidential information, in violation of federal law. Such an inference would not be reasonable based on the allegations in the complaint.

state a claim was in error.[15]

## 2. The Pickering Test

Defendants argue alternatively that even if Decotiis was speaking as a citizen on a matter of public concern, her speech was nevertheless unprotected under the Pickering test. The Pickering test attempts to "balance the value of an employee's speech — both the employee's own interests and the public's interest in the information the employee seeks to impart — against the employer's legitimate government interest in 'preventing unnecessary disruptions and inefficiencies in carrying out its public service mission.'" Guilloty Perez v. Pierluisi, 339 F.3d 43, 52 (1st Cir. 2003) (quoting O'Connor v. Steeves, 994 F.2d 905, 915 (1st Cir. 1993)); see also Pickering, 391 U.S. at 568 ("The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the

---

[15] This result may lead one to question whether a defendant could ever prevail on a motion to dismiss where the parties contest whether the employee spoke as a citizen. We can only note that there are reported cases in which dismissal for failure to state a claim was held to be appropriate. See Abcarian v. McDonald, 617 F.3d 931, 937 (7th Cir. 2010) (affirming the grant of a motion to dismiss, in part on the grounds that a "natural reading of the allegations" in the complaint led to the conclusion that the employee spoke pursuant to his employment duties). It is also true, however, that much like the Pickering balancing test, the fact-intensive nature of the Garcetti analysis does not easily lend itself to dismissal on a Rule 12(b)(6) motion. Cf. Jordan v. Carter, 428 F.3d 67, 73 (1st Cir. 2005) (noting that, on a motion to dismiss, the court had little on which to base the "particularized" inquiry envisioned by Pickering).

efficiency of the public services it performs through its employees.").

In assessing the government's interest in allaying disruption and inefficiencies in the workplace, a court should include in its considerations (1) "the time, place, and manner of the employee's speech," and (2) "the employer's motivation in making the adverse employment decision." Davignon v. Hodgson, 524 F.3d 91, 104 (1st Cir. 2008). As with the Garcetti analysis, the Pickering balancing test requires a hard look at the facts of the case, including the nature of the employment and the context in which the employee spoke. See id.

The district court noted that Plaintiff's speech was likely not protected under Pickering because she addressed only those with whom she came in contact through her job, and not a wider audience. Decotiis, 680 F. Supp. 2d at 271. Taking the district court's conclusion one step further, Defendants argue that CDS-Cumberland has a strong interest in restricting Decotiis's speech to prevent her from interfering with its ability to effectively communicate with the vulnerable population it serves. In their view, CDS's mission was undermined when Decotiis urged parents to contact advocacy agencies and planted seeds of doubt as to the legality of CDS-Cumberland's policies. Decotiis responds that Defendants' bald assertions of workplace disruption are insufficient to meet the Pickering standard.

The posture of the case makes such a "particularized" inquiry relatively uninformed, especially when assessing the government's interests. See Jordan, 428 F.3d at 73. Considering Plaintiff's interests first, the value of the employee's speech appears significant. In addition to Decotiis's interest in her own speech, the public also had a non-trivial interest in the information Decotiis sought to convey, i.e., that a state-supervised agency may have been illegally denying special education services to the children it was charged with serving.

On Defendants' side, the complaint does not reveal the exact time, place, and manner of Decotiis's speech, but it does state that Decotiis spoke to her clients' parents. While questioning the legality of CDS-Cumberland's policies in the presence of its clients' parents could result in significant disruption and inefficiency, with only the facts in the complaint before us, we cannot say that such a risk of disruption and inefficiency outweighs the important interests served by Decotiis's speech.[16] This is especially so because we must consider the motivation underlying the non-renewal. Accepting the complaint's

---

[16] Decotiis argues that her status as a government contractor, rather than a government employee, abates Defendants' interest in controlling her speech. See Umbehr, 518 U.S. at 684 ("Independent government contractors are similar in most relevant respects to government employees, although both the speaker's and the government's interests are typically — though not always — somewhat less strong in the independent contractor case."). But we need not consider this argument because we conclude that the balancing weighs in Decotiis's favor even if she were a government employee and not a contractor.

well-pleaded facts as true, the sole motivation behind the non-renewal was retaliation, not the furtherance of governmental interests.  Having concluded that the Pickering balancing test tips in Plaintiff's favor, we hold that the complaint alleges a plausible constitutional violation.

## B.   Qualified Immunity

The district court held that Defendant Whittemore, in her individual capacity, is entitled to qualified immunity because the law was not so clearly established as to put Whittemore on fair notice that she would be violating Decotiis's First Amendment rights by not renewing her contract. Decotiis, 680 F. Supp. 2d at 274.  We agree with the district court.

"The qualified immunity doctrine provides defendant public officials an immunity from suit and not a mere defense to liability."  Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009).  To prevent the unnecessary litigation of claims from which public officials are immune, "immunity is to be resolved at the earliest possible stage in litigation."  Id.  A plaintiff may overcome qualified immunity by first making out the violation of a constitutional right, and second, establishing that the "right was 'clearly established' at the time of the defendant's alleged violation."  Id. at 268-69 (quoting Pearson v. Callahan, 555 U.S. 223 (2009)).  The "clearly established" step comprises two subparts:  first, whether "the contours of the right [were]

sufficiently clear that a reasonable official would understand that what he is doing violates that right," and second, "whether in the specific context of the case, 'a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights.'" Mosher v. Nelson, 589 F.3d 488, 493 (1st Cir. 2009).[17] The second step in the inquiry, "while requiring a legal determination, is highly fact specific." Estrada v. Rhode Island, 594 F.3d 56, 63 (1st Cir. 2010) (quoting Nelson v. Kline, 242 F.3d 33, 35 n.2 (1st Cir. 2001)).

A right is considered clearly established if viewed objectively "at the time the defendant acted, he was on clear notice that what he was doing was unconstitutional." Costa-Urena v. Segarra, 590 F.3d 18, 29 (1st Cir. 2009); see also Philip v. Cronin, 537 F.3d 26, 34 (1st Cir. 2008) (citing Harlow v. Fitzgerald, 457 U.S. 800, 819 (1982)).[18] For a constitutional right to be clearly established there does not need to be a prior case with factually identical circumstances finding such a right. Mosher, 589 F.3d at 493. Rather, "notable factual differences may

---

[17] In Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009), we formally abandoned our use of the three-step analysis and adopted the Supreme Court's two-part test; however, here, we spell out the two subparts of the second prong because, as we noted, it is "faithful to the substance" of the Supreme Court's test. Id.

[18] The complaint states that Whittemore was "motivated by actual malice" or that malice could be implied from her conduct. (Compl. ¶ 57.) This does not affect our analysis, because an allegation of malice does not defeat qualified immunity. Brown v. Ives, 129 F.3d 209, 211 (1st Cir. 1997).

-26-

exist between prior cases and the circumstances at hand as long as the state of the law at the time gave the defendant 'fair warning' that his action or inaction was unconstitutional." Id. (quoting Hope v. Pelzer, 536 U.S. 730, 741 (2002)). In other words, for the right to be clearly established, the plaintiff must point to controlling authority or a body of persuasive authority, existing at the time of the incident, that can be said to have provided the defendant with "fair warning." See Wilson v. Layne, 526 U.S. 603, 617 (1999).

At the time of Whittemore's alleged retaliatory action, the Supreme Court's decision in Garcetti was the only controlling case in the First Circuit, and even Garcetti stated that its analysis was not to be mistaken for "a comprehensive framework for defining the scope of an employee's duties in cases where there is room for serious debate." 547 U.S. at 424. There were no decisions in this circuit explaining the scope of a public employee's employment duties and what it means to speak pursuant to those duties, nor was there a body of decisions from other circuits that could be said to have put Whittemore on clear notice. Even though the broad constitutional rule, as set forth in Garcetti, may have been clearly established, the contours of the right were still cloudy.

This is illuminated by the analysis of the parties and the district court. The two cases the parties rely on most heavily

-27-

in arguing that the Garcetti analysis must be resolved in their respective favor, Green, 472 F.3d 794 (relied on by Defendants), and Reinhardt v. Albuquerque Pub. Sch. Bd. of Ed., 595 F.3d 1126 (10th Cir. 2010) (relied on by Decotiis), reveal the muddiness of this area of the law.  Both decisions came from the Tenth Circuit; they are thoughtful and compatible with one another; they concern somewhat similar factual situations; but neither makes the outcome of this case clear.  What is more, Reinhardt had not been decided at the time of Whittemore's alleged retaliation.  As our discussion above of the alleged constitutional violation makes pellucid, even in light of the recent developments in this area of the law, this is a close case.

Furthermore, though we conclude that Decotiis stated a plausible claim for relief, the district court's opinion was a well-reasoned exposition reflecting a thoughtful analysis of the law as it existed at the time.  This lends support to the conclusion that the state of the law at the time of the alleged constitutional violation was not clear enough in the circuits generally, and in this circuit particularly, to put Whittemore on fair notice that her actions constituted a constitutional deprivation.  Cf. Wilson, 526 U.S. at 618 ("If judges thus disagree on a constitutional question, it is unfair to subject police to money damages for picking the losing side of the controversy.").

We therefore hold that regardless of whether Whittemore

-28-

did in fact violate Plaintiff's First Amendment rights, which is yet to be determined, a reasonable person in Whittemore's position could have believed that she was not violating Decotiis's constitutional rights by not renewing her contract. As such, qualified immunity is available to Whittemore in her individual capacity.[19]

## C. Claims against Hannigan and CDS-Cumberland

In light of its conclusion that Decotiis had failed to make out a constitutional claim against Whittemore, the district court dismissed the supervisory liability claim against Hannigan, along with the claim against CDS-Cumberland based on practice, custom, or policy, and adequate employee training. The district court did not reach Defendants' Eleventh Amendment immunity argument, but it noted that dismissal on those grounds was "likely appropriate" as to CDS-Cumberland and Hannigan. Decotiis, 680 F. Supp. 2d at 275 n.6.

We vacate the dismissal of the claims against Hannigan and CDS-Cumberland because our conclusion that Decotiis adequately pled a constitutional violation as to Whittemore nullifies the

---

[19] The district court dismissed the action against Whittemore in her official capacity as redundant given that CDS-Cumberland is also a defendant to this suit. See Kentucky v. Graham, 473 U.S. 159, 166 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); Surprenant v. Rivas, 424 F.3d 5, 19 (1st Cir. 2005) ("A suit against a public official in his official capacity is a suit against the governmental entity itself."). Plaintiff does not challenge this dismissal on appeal.

district court's grounds for dismissal as to Hannigan and CDS-Cumberland. Because the parties did not brief the sufficiency of Decotiis's claims against Hannigan or CDS-Cumberland under these circumstances, we leave the issues for the district court's determination, if necessary, on remand. Similarly, the parties did not address in their briefing or arguments whether Defendants are entitled to Eleventh Amendment immunity, and so we do not express an opinion on the matter.

## III.

For the foregoing reasons, we <u>affirm</u> the judgment of the district court as to Defendant Whittemore, <u>vacate</u> the judgment of the district court as to Defendants Hannigan and CDS-Cumberland, and <u>remand</u> for further proceedings consistent with this opinion. Each party shall bear its own costs.

<u>So ordered</u>.