# United States Court of Appeals
## For the First Circuit

No. 09-2575

MARÍA S. DÍAZ-BIGIO,

Plaintiff, Appellee,

v.

JORGE SANTINI, in his official and personal capacity as Mayor;
DR. ALFREDO ESCALERA, in his official and personal capacity;
MARITZA AGUILAR-JUSINO, in her official and personal capacity;
JORGE COLOMER-MONTES, in his official and personal capacity;
ELMER SAURÍ-SANTIAGO, in his official and personal capacity,

Defendants, Appellants,

MUNICIPALITY OF SAN JUAN, ET AL.,

Defendants.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

[Hon. Harry D. Leinenweber,[*] U.S. District Judge]

Before

Lynch, Chief Judge,
Torruella and Siler,[**] Circuit Judges.

Eliezer A. Aldarondo-López, with whom Claudio Aliff-Ortiz,
Iván M. Castro-Ortiz, and Aldarondo & López Bras, PSC were on
brief, for appellant Aguilar-Jusino.

---

[*]     Of the Northern District of Illinois, sitting by
designation.

[**]     Of the Sixth Circuit, sitting by designation.

Vanessa Saxton-Arroyo, with whom Toledo & Toledo Law Offices PSC was on brief, for appellant Escalera.

Francisco J. Amundaray, with whom Ricardo Pascual and Mercado, Soto, Ronda, Amundaray & Pascual, PSC were on brief, for appellants Santini, Colomer-Montes, and Saurí-Santiago.

Rosa M. Seguí Cordero, with whom Simonet Sierra Law Office was on brief, for appellee.

_____

June 29, 2011

_____

**LYNCH**, <u>**Chief Judge**</u>.  Plaintiff Maria Díaz-Bigio, who was a Medical Social Worker at the Health Department of San Juan, Puerto Rico, brought this suit against the Municipality of San Juan and several city officials under 42 U.S.C. § 1983, alleging that they fired her in retaliation for statements she made on matters of public concern in violation of the First Amendment.  Her complaint requested reinstatement and monetary damages.  Before us is an interlocutory appeal from the district court's denial of summary judgment to the individual defendants in their personal capacities on grounds of qualified immunity.

Díaz-Bigio made statements in August 2004 accusing the Executive Director of the Health Department of having a serious conflict of interest.  In both print and radio media, she alleged that he had economic interests in companies and a medical group that had been given Health Department contracts.  The city immediately investigated these charges, and Díaz-Bigio was twice issued a summons to provide testimony in support of her allegations, but she refused to do so.  After the investigation concluded that the charges were false and groundless, the city notified Díaz-Bigio that it intended to terminate her employment and that she had the right to an administrative hearing on the issue.  After that hearing on December 6, in which she again declined to testify, she was fired.  The letter of termination informed her that in making false and groundless allegations

against the Executive Director of the Health Department and failing to comply with the summons to appear before the body investigating her allegations, she had broken several laws and regulations governing her obligations as a public employee.

The question before us is whether the undisputed facts of the record demonstrate that a reasonable public official could have concluded that terminating Díaz-Bigio's employment in these circumstances would not violate her First Amendment rights. The answer to this question determines whether the defendants are entitled to qualified immunity. The district court concluded that they are not. Díaz-Bigio v. Municipality of San Juan, No. 06-1704, 2009 WL 3497961 (D.P.R. Oct. 28, 2009). We reverse and direct entry of judgment for defendants in their individual capacities on grounds of qualified immunity.

I.

A claim of qualified immunity demands deference to the objectively reasonable beliefs and actions of the defendants as to the constitutionality of their actions, even if the beliefs are mistaken. Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2085 (2011). The summary judgment standard requires that reasonable inferences be drawn in Díaz-Bigio's favor, as long they are based on facts that "are put forward on personal knowledge or otherwise documented by materials of evidentiary quality." Morelli v. Webster, 552 F.3d 12, 18-19 (1st Cir. 2009). We identify the "version of events that

best comports with the summary judgment standard and then ask[] whether, given that set of facts, a reasonable officer should have known that his actions were unlawful." Id. at 19.

On August 16, 2004, Díaz-Bigio, apparently acting as the president of the Brotherhood of Health Employees, made statements during a demonstration in front of San Juan's Puerto Nuevo Health Plus Center. In radio interviews and statements to newspapers, Díaz-Bigio accused the Executive Director of San Juan's Health Department, defendant Dr. Alfredo Escalera, of having economic interests in a medical group that had a contract with the Center and in private companies that provided emergency room, laboratory, x-ray, and dental services to the Center. Díaz-Bigio further alleged that this conflict of interest was responsible for differences in the quality of the conditions in different areas of the hospital to the benefit of Escalera.

In an interview on WAPA Radio, Díaz-Bigio stated that the air conditioning "works in the areas of the hospital that Escalera has privatized which is the emergency room, laboratory, X-Rays and dental areas," but that "in the areas under San Juan Municipal control, that are not generating money for Escalera, it is not working." When asked, "Is it not generating money for the Health Plus Center?" she responded, "No, it is generating money for Escalera." This allegation was also reported in the El Vocero newspaper, which quoted Díaz-Bigio as saying that the emergency

room, laboratory, x-rays, and dental area of the Center "have air conditioning and are in good condition because they belong to the San Juan Vice-Mayor and Health Medical Director, Dr. Alfredo Escalera."

Díaz-Bigio also stated, in an interview on Radio Puerto Rico, that Dr. Escalera "is the owner of the Emergency Rooms," and when a reporter asked what proof she had of this, she told the reporter to look in the records of corporations registered with the Puerto Rico State Department. She said, "You make the search, I tell you what there is," but when asked for the name of the corporation recorded with the State Department, she responded: "I don't know, I can't tell you that. . . . The owner is Alfredo Escalera. If with a group . . . it's as if it were an IPA."

Díaz-Bigio repeated her allegations in a press conference on September 1, 2004. As reported the following day in the El Nuevo Dia newspaper: "Maria Díaz-Bigio said that Dr. Escalera 'Owns the MPL', but when she was asked to substantiate the accusations, she declined to do so." This article also reported that the Executive Director of the Brotherhood "was more cautious and underscored that although he could not accuse Escalera of having a contractual relation with the privatizing entity, he did allege that he had 'some type of economic ties' with that company."

On August 17, 2004, the day after Díaz-Bigio first made her accusations against Escalera, the Mayor of San Juan, defendant

-6-

Jorge Santini, ordered San Juan's Internal Auditing Office to initiate an internal investigation to determine whether the allegations were true. The investigation was overseen by defendant Elmer Saurí-Santiago, the Director of the Internal Auditing Office, who explained in a report to the Mayor that the investigation was carried out "in accordance with generally accepted governmental rules and procedures in current auditing practices," using a methodology that included obtaining statements under oath from the implicated parties and reviewing pertinent documentary evidence.

Several sources of documents were considered in the investigation. Records in the State Department were reviewed to identify the directors and officers of the medical group operating at the Center. Although Díaz-Bigio had claimed that this would show that the group was controlled by Dr. Escalera, the investigation found that Dr. Escalera was not among the group's directors or officers during the relevant time period. The medical group's contract with the Center was also reviewed to determine when the contractual relationship originated and to identify the executing parties. The investigation found that Dr. Escalera was not an original party and that the relationship originated before Dr. Escalera was a member of the cabinet of the municipal administration. Finally, a certified report from the Collections and Revenue Office showed that the city, and not Dr. Escalera, was

receiving the payments from the Center's emergency room, laboratory, x-rays, and dental services.

The Internal Auditing Office also obtained statements under oath from Dr. Escalera, the contractors in the privatized medical service areas, and the administrator and director of the Center, none of which provided any support for Díaz-Bigio's allegations.

Díaz-Bigio was aware that her claims against Dr. Escalera were under investigation. On August 26, and again on August 30, she was issued a summons to appear at the Internal Auditing Office to make a statement under oath about everything that she knew regarding her allegations, but she did not comply, despite express instructions to do so from her supervisor. She did not comply with the first summons because it requested that she appear three hours after it was served and her attorney and union representative were unavailable. She wrote a letter requesting that the appearance be rescheduled and that she be given more notice. For the second summons, she appeared at the requested time at the Internal Auditing Office accompanied by her attorney and a representative from the Brotherhood. When she was told that she needed to go into the office alone, however, she declined to do so and left without providing a statement.[1]

----

[1] On September 3, 2004, Díaz-Bigio filed a complaint with San Juan's Equal Employment Opportunity Office, alleging that she had been the "victim of unfair, unequal and discriminatory

On September 9, 2004, defendant Saurí-Santiago provided a report on the investigation's findings to the Mayor. Summarizing the evidence described above, he explained that the investigation "was able to determine that there is insufficient competent and relevant evidence to validate the expressions that were made by Mrs. Maria Díaz-Bigio to the Press." He stated that the investigation concluded that Díaz-Bigio's allegations "are lacking in grounds," and that this was based on "evidence and testimony that . . . we consider to be competent, sufficient and relevant." The report concluded with recommendations that the Mayor send a copy of the report to the Puerto Rico Governmental Ethics Office, which was investigating the same matter, and that the Director of Human Resources for the Municipality of San Juan evaluate the report so that "appropriate action" could be taken.

On September 20, 2004, the Director of Human Resources, defendant Martiza Aguilar-Jusino, sent a letter to Díaz-Bigio notifying her that the city intended to terminate her employment and that she had a right to a pre-termination hearing. The letter summarized the allegations that Díaz-Bigio had made against Dr. Escalera and informed her that based on an analysis of the documents and testimony, her allegations were found to be false and

---

treatment" when she was prevented from bringing her attorney and the representative from the Brotherhood into her meeting at the Internal Auditing Office. There is nothing in the record about the outcome of this complaint.

groundless. It explained that she had obstructed the Internal Auditing Office's investigation by failing to comply with express instructions to appear and provide a statement in support of her allegations. The letter also explained that in making these groundless allegations of conflict of interest and failing to respond to the Internal Auditing Office's summons, Díaz-Bigio had violated several provisions of the laws and regulations defining the duties and obligations of San Juan employees, including the Governmental Ethics Regulation and the San Juan Municipal Conduct and Disciplinary Actions Regulation. These regulations require that employees not take actions that will "adversely affect the trust of the public in the integrity and honesty of governmental institutions," that they not make "false or defamatory averments against other employees, supervisors, directors or against the Nominating Authority," and that they "appear at a citation or summons for an administrative procedure hearing or for an investigation." Noting that Díaz-Bigio had been subject to earlier disciplinary actions in 2002 and 2003, including a suspension for 10 days without pay, the letter explained that her "reiterated pattern of conduct that violates the disciplinary rules applicable to the employees of the Municipality of San Juan constitutes a breach of labor peace and the defamatory and vicious nature of [the] accusations justifies the filing of new charges."

On December 6, 2004, the administrative hearing on Díaz-Bigio's termination was held. Díaz-Bigio was present with counsel, but refused to present any testimony or evidence on her behalf. She stated she would not do so, on advice of counsel, because the Governmental Ethics Office was in an ongoing investigation of Dr. Escalera's alleged conflict of interest.

While the outcome of that hearing was pending, the Puerto Rico Governmental Ethics Office issued a summons for Díaz-Bigio to attend an interview on June 7, 2005, stating that she must bring any documents, papers, or other "tangible things" containing evidence that supported her allegations against Dr. Escalera. It is unclear whether she provided the office with any such evidence. In her deposition for this case, Díaz-Bigio stated that she could not remember whether she brought any evidence. She also made an admission that she never had any documents to sustain her allegations and that the allegations were made relying on "information" received at the Brotherhood.

In a letter dated June 28, 2005, San Juan's Secretary for Administration, defendant Jorge Colomer-Montes, informed Díaz-Bigio that she was being dismissed from her position in conformity with the recommendation of the administrative panel after the hearing. This letter reiterated the grounds for dismissal that were listed in the September 20, 2004 letter from defendant Aguilar-Jusino.

After Díaz-Bigio was dismissed, the Puerto Rico Governmental Ethics Office completed its investigation of her August claims that Dr. Escalera acted with a conflict of interest. It found that Díaz-Bigio's allegations were groundless and concluded that Dr. Escalera did not have "an economic interest in said companies or a contractual relationship in this matter."

None of these facts are disputed by Díaz-Bigio.

II.

In general, "the denial of a motion for summary judgment is not immediately appealable, but a denial of qualified immunity may be appealed to the extent the decision is a 'purely legal' one." Rodríquez-Rodríquez v. Ortiz-Vélez, 391 F.3d 36, 39 (1st Cir. 2004). We have jurisdiction to decide whether Díaz-Bigio's "own version of events together with uncontested facts entitles the defendant[s] to immunity." Id. at 40; see also Valdizán v. Rivera-Hernandez, 445 F.3d 63, 65 (1st Cir. 2006) ("[T]he court of appeals retains jurisdiction to entertain an immediate appeal in 'situations in which the district court assumes a set of facts and decides, as a matter of law, that those facts will not support a qualified immunity defense.'" (quoting Camilo-Robles v. Hoyos, 151 F.3d 1, 8 (1st Cir. 1998))).

A.      Qualified Immunity

The doctrine of qualified immunity protects public officials "from liability for civil damages insofar as their

-12-

conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 129 S. Ct. 808, 815 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)) (internal quotation marks omitted). It provides "immunity from suit and not a mere defense to liability." Maldonado v. Fontanes, 568 F.3d 263, 268 (1st Cir. 2009).

Under Pearson, we follow a two-prong analysis for determining whether defendants are entitled to qualified immunity, asking "(1) whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right; and (2) if so, whether the right was 'clearly established' at the time of the defendant's alleged violation." Id. at 269; see also al-Kidd, 131 S. Ct. at 2083. The second prong, in turn, has two parts: (a) whether the legal contours of the right in question were sufficiently clear that a reasonable official would have understood that what he was doing violated that right, and (b) whether the particular factual violation in question would have been clear to a reasonable official. Decotiis v. Whittemore, 635 F.3d 22, 36 (1st Cir. 2011). The salient question is whether the state of the law at the time gave a defendant "clear notice that what he was doing was unconstitutional." Id. at 37 (quoting Costa-Urena v. Segarra, 590 F.3d 18, 29 (1st Cir. 2009)) (internal quotation mark omitted).

-13-

Unlawfulness must be apparent at the time of the alleged violation "in the light of pre-existing law." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "Immunity exists even where the abstract 'right' invoked by the plaintiff is well-established, so long as the official could reasonably have believed 'on the facts' that no violation existed." Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002). Although the Supreme Court has made clear that municipal officers can "be on notice that their conduct violates established law even in novel factual circumstances," Hope v. Pelzer, 536 U.S. 730, 741 (2002), it has also stressed that qualified immunity "protects 'all but the plainly incompetent or those who knowingly violate the law,'" al-Kidd, 131 S. Ct. at 2085 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).

A right is clearly established and immunity will not issue only if "every 'reasonable official would have understood that what he is doing violates that right.'" Id. at 2083 (quoting Anderson, 483 U.S. at 640) (emphasis added). If "officers of reasonable competence could disagree" on the lawfulness of the action, they are entitled to immunity. Malley, 475 U.S. at 341.

B.      The First Amendment

Although this case is about qualified immunity, we start with the general requirements of a First Amendment retaliation claim by a public employee. The law is "settled that as a general

-14-

matter the First Amendment prohibits government officials from subjecting an individual to retaliatory actions . . . for speaking out," Hartman v. Moore, 547 U.S. 250, 256 (2006),[2] but this prohibition is not absolute. "[I]n recognition of the government's interest in running an effective workplace, the protection that public employees enjoy against speech-based reprisals is qualified." Decotiis, 635 F.3d at 29 (quoting Mercado-Berrios v. Cancel–Alegría, 611 F.3d 18, 26 (1st Cir. 2010)) (internal quotation marks omitted); see also Rivera-Jiménez v. Pierluisi, 362 F.3d 87, 94 (1st Cir. 2004). Three requirements must be met to make out a claim of unconstitutional retaliation in public employee speech cases. Decotiis, 635 F.3d at 29-30.

First, the employee must have been speaking "as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S. 410, 418 (2006). Otherwise, "the employee has no First Amendment cause of action based on his or her employer's reaction to the speech." Id.; see also Snyder v. Phelps, 131 S. Ct. 1207, 1215 (2011) ("[S]peech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection.'" (alteration in

---

[2] See also Powell v. Alexander, 391 F.3d 1, 16-17 (1st Cir. 2004) ("Retaliation, though it is not expressly referred to in the Constitution, is nonetheless actionable because retaliatory actions may tend to chill individuals' exercise of constitutional rights." (quoting ACLU of Md., Inc. v. Wicomico Cnty., 999 F.2d 780, 785 (4th Cir. 1993)) (internal quotation marks omitted)).

-15-

original) (quoting Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc., 472 U.S. 749, 758-759 (1985))).

Second, under the balancing test of Pickering v. Board of Education, 391 U.S. 563, 568 (1968), the employee's First Amendment interests in the speech must "outweigh the government's interests as an employer in avoiding disruption in the workplace." Rivera-Jiménez, 362 F.3d at 94. This balancing test "is necessary in order to accommodate the dual role of the public employer as a provider of public services and as a government entity operating under the constraints of the First Amendment." Rankin v. McPherson, 483 U.S. 378, 384 (1987).

Third, the employee must meet the "burden of producing sufficient direct or circumstantial evidence from which a jury reasonably may infer that his constitutionally protected conduct . . . was a 'substantial' or 'motivating' factor behind his dismissal."[3] Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir. 1993); see also Guilloty Perez v. Pierluisi, 339 F.3d 43, 56 (1st Cir. 2003).

---

[3] The employee's burden of proving motivation "is more substantial than the burden of producing prima facie evidence in, for example, the first stage of a Title VII discrimination case." Guilloty Perez v. Pierluisi, 339 F.3d 43, 56 n.11 (1st Cir. 2003). The employee "must produce sufficient evidence of motivation at the initial stage such that 'the burden of persuasion itself passes to the defendant-employer.'" Id. (quoting Acevedo-Diaz v. Aponte, 1 F.3d 62, 67 (1st Cir.1993)).

-16-

If an employee succeeds in establishing this causal relationship, an employer can still defeat the claim "by proving by a preponderance of the evidence that the governmental agency would have taken the same action against the employee 'even in the absence of the protected conduct.'" Id. (quoting Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 287 (1977)). These two criteria--"the 'but for' causation test" and "the defendant-employer's 'Mt. Healthy defense'"--"ensure[] that a plaintiff-employee who would have been dismissed in any event on legitimate grounds is not placed in a better position merely by virtue of the exercise of a constitutional right irrelevant to the adverse employment action." Acevedo-Diaz v. Aponte, 1 F.3d 62, 66 (1st Cir. 1993); see also Mt. Healthy, 429 U.S. at 285.

C.    The Termination of Díaz-Bigio's Employment

Assuming arguendo that the facts alleged by Díaz-Bigio set forth a claim of a First Amendment violation, we turn to the second prong of Pearson and ask whether a reasonably competent city official could have thought that he or she would not violate the First Amendment by terminating Díaz-Bigio's employment given the circumstances of the case--where the city investigated Díaz-Bigio's much publicized allegations of serious improprieties by the executive director of her department, where she refused to provide testimony or evidence to corroborate her claims, where the investigation determined that the claims were false and baseless,

-17-

and where her actions were found to violate state and local regulations.

Under a long line of cases from this circuit granting qualified immunity, the defendants are entitled to summary judgment because the outcome of the Pickering balancing of interests in this case was not so clear as to put all reasonable officials on notice that firing Díaz-Bigio would violate the law. Reasonable officials could well have concluded there was no First Amendment violation on these facts. See, e.g., Philip v. Cronin, 537 F.3d 26, 31, 34 (1st Cir. 2008) (administrator of medical examiner's office could have reasonably believed that firing an examiner who had sent letters to the governor criticizing procedures used in office would not violate First Amendment when there were other complaints about his conduct); Wagner v. City of Holyoke, 404 F.3d 504, 507, 509 (1st Cir. 2005) (police officials could have reasonably believed that firing sergeant who made public allegations of corruption and discrimination in police department would not violate First Amendment when sergeant had, in doing so, disregarded confidentiality protocols and bypassed chain of command); Fabiano v. Hopkins, 352 F.3d 447, 450, 456, 458 (1st Cir. 2003) (city officials could have reasonably believed that firing city attorney who filed pro se suit alleging improper variance renewal by city's zoning board of appeal would not violate First Amendment, even though city eventually admitted allegations' truth, when lawsuit

-18-

created potential conflict of interest); Dirrane, 315 F.3d at 68, 70-71 (police officials could have reasonably believed that transferring an officer who had made complaints about the falsification and destruction of fingerprint reports would not violate First Amendment under circumstances of case); O'Connor v. Steeves, 994 F.2d 905, 908, 916 n.8, 917 n.11 (1st Cir. 1993) (town selectman could have reasonably believed that firing employee who had publicly accused selectman of personal use of town funds would not violate First Amendment even though allegations's truth was undisputed, as outcome of Pickering balance was unclear).

As we have previously highlighted, "[w]e and other circuits have noted that the Pickering balancing is 'subtle, yet difficult to apply, and not yet well defined,' and that, consequently, only in the extraordinary case will it have been clearly established that a public employee's speech merited constitutional protection." Jordan v. Carter, 428 F.3d 67, 75 (1st Cir. 2005) (citation omitted) (quoting Pike v. Osborne, 301 F.3d 182, 185 (4th Cir. 2002)); see also Brewster v. Board of Educ., 149 F.3d 971, 980 (9th Cir. 1998) (listing cases).

Indeed, two years before Díaz-Bigio's termination, this court held in Fabiano that "[b]ecause Pickering's constitutional rule turns upon a fact-intensive balancing test, it can rarely be considered 'clearly established'" for qualified immunity purposes. Fabiano, 352 F.3d at 457 (quoting O'Connor, 994 F.2d at 917 n.11)

(internal quotation marks omitted).  Likewise, in <u>Frazier</u> v. <u>Bailey</u>, 957 F.2d 920 (1st Cir. 1992), we held that "if the existence of a right or the degree of protection it warrants in a particular context is subject to a balancing test, the right can rarely be considered 'clearly established,' at least in the absence of closely corresponding factual or legal precedent."  <u>Id.</u> at 931 (quoting <u>Myers</u> v. <u>Morris</u>, 810 F.2d 1437, 1462 (8th Cir. 1987)) (internal quotation marks omitted).  The case before us--in which an investigation concluded that there was no basis for Díaz-Bigio's very serious allegations of impropriety and self-dealing--is not the exceptional case in which all reasonable officials would have concluded they were barred by the First Amendment from terminating her employment.

First, although Díaz-Bigio's allegations that a senior public official had a conflict of interest that potentially violated the law were on a clear matter of public concern,[4] this fact weighs on both sides of the <u>Pickering</u> balancing test, as it

---

[4]    <u>See</u>, <u>e.g.</u>, <u>O'Connor</u> v. <u>Steeves</u>, 994 F.2d 905, 915 (1st Cir. 1993) ("[A]llegations of improper purchases clearly constituted a matter of legitimate public concern."); <u>see also</u> <u>Propst</u> v. <u>Bitzer</u>, 39 F.3d 148, 152 (7th Cir. 1994) (holding that allegations of misuse of university funds touched upon matters of public concern); <u>Conaway</u> v. <u>Smith</u>, 853 F.2d 789, 797 (10th Cir. 1988) ("Speech that seeks to expose improper operations of the government or questions the integrity of governmental officials clearly concerns vital public interests."); <u>McDowell</u> v. <u>Paiewonsky</u>, 769 F.2d 942, 948 (3rd Cir. 1985) (holding that a "possible conflict of interest of a government official" and "the awarding of government contracts" are undeniably matters of public concern).

means that the allegations could also prove highly disruptive to public trust and confidence in the accused government office and the functioning of the office. At the time of Díaz-Bigio's termination, the law recognized that a government employer has a strong interest in "preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." Guilloty Perez, 339 F.3d at 52 (quoting O'Connor, 994 F.2d at 915) (internal quotation marks omitted).

Also clear was the government's "wide discretion and control over the management of its personnel and internal affairs . . . includ[ing] the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." Connick v. Myers, 461 U.S. 138, 151 (1983) (quoting Arnett v. Kennedy, 416 U.S. 134, 168 (1974) (Powell, J., concurring in part)). Public employers need not allege or show that an employee's speech actually disrupted the workplace, and substantial weight has been given "to government employers' reasonable predictions of disruption." Waters v. Churchill, 511 U.S. 661, 673 (1994); see also Curran v. Cousins, 509 F.3d 36, 49 (1st Cir. 2007) ("An employer need not show an actual adverse effect in order to terminate an employee under the Garcetti/Pickering test."). Here, the nature of Díaz-Bigio's conduct supported a reasonable prediction that her retention could cause disruption.

That Díaz-Bigio made false and groundless allegations could have been reasonably seen as part of a broader disciplinary problem--a problem that included her refusal to appear before the Internal Auditing Office's investigation after receiving a summons and order to do so, as well as the behavior for which she had been subject to prior disciplinary actions. The legitimate interest of public employers in maintaining discipline is well established. See, e.g., Rankin v. McPherson, 483 U.S. 378, 388 (1987) ("We have previously recognized as pertinent considerations whether the statement impairs discipline by superiors . . . ."); Guilloty Perez, 339 F.3d at 53 (recognizing discipline as relevant consideration). Here, this interest was formally stated in a regulation, noted in the termination letter, authorizing disciplinary action for employees who make "false or defamatory averments against other employees, supervisors, directors, or against the Nominating Authority." In addition, in failing to appear before the Internal Auditing Office to substantiate her allegations, Díaz-Bigio violated a direct order from her supervisor and a regulation requiring that employees "appear at a citation or summons for an administrative procedure hearing or for an investigation." Reasonable officials would have found those facts supportive of the view that her employment could be terminated.

Defendants could have also reasonably concluded that they did not have the necessary confidence and trust in Díaz-Bigio to

maintain her employment going forward.  See Foote v. Town Of Bedford, No. 10-2094, 2011 WL 1499901, at *4 (1st Cir. Apr. 21, 2011) ("'Precisely because [the plaintiffs'] speech did bear on the job and on their working relationship,' the employer 'was permitted to conclude reasonably that she did not have the necessary trust and confidence to retain them.'" (quoting Flynn v. City of Boston, 140 F.3d 42, 47 (1st Cir. 1998))); Rendish v. City of Tacoma, 123 F.3d 1216, 1225 (9th Cir. 1997) (city had valid concerns supporting termination when employee's allegations "demonstrated lack of trust and confidence in the department").

That the city first investigated the allegations, then learned that they were false and groundless, and only then terminated Díaz-Bigio's employment further supports the grant of qualified immunity.  The truth or falsity of an employee's speech is in itself a factor that is relevant in striking the balance between the employee's right to free speech and the government's interest in efficient administration.  Brasslett v. Cota, 761 F.2d 827, 839 (1st Cir. 1985) ("[A]n employer has a greater interest in curtailing erroneous statements than correct ones, and still a greater interest in curtailing deliberate falsehoods."); see also See v. City of Elyria, 502 F.3d 484, 493 (6th Cir. 2007) (stating that falseness of statements should be considered under Pickering); Johnson v. Multnomah County, 48 F.3d 420, 424 (9th Cir. 1995) (same).  Here, the city took Díaz-Bigio's charges seriously and

-23-

investigated them, basing its termination decision on the fact that they were found false and groundless. Cf. Dirrane, 315 F.3d at 70 (if an investigation had "determined that the allegations were unfounded, the disruption they generated would have amply justified" the transfer of the employee under Pickering); Brewster, 149 F.3d at 981 (under Pickering, termination of employment was supported by the fact that employee's allegations were ultimately determined to be false, both by his employer and by a team of independent auditors). Of particular significance is the fact that Díaz-Bigio failed to provide any evidence in support of her allegations, despite requests and orders. A reasonable public official could have easily concluded that the city could lawfully fire an employee who made false allegations of possible criminal activity by the executive director of a municipal department without providing any supporting evidence.

On the facts of this case, a reasonable public official even could have concluded that Díaz-Bigio made the allegations with reckless indifference to the truth, and that this in itself permitted termination. While the Supreme Court in Pickering "expressly declined to adopt a rule directing that knowingly or recklessly false statements are per se unprotected . . . the fact that a statement is recklessly false may well create a presumption that the employee's interest in uttering it is subordinate to the government's interest in suppressing it." Brasslett, 761 F.2d at

-24-

840; see also Gossman v. Allen, 950 F.2d 338, 342 (6th Cir. 1991) ("If an official reasonably believes that an employee made statements with knowledge of, or reckless indifference to, their falsity, the official would conclude that the employee could be fired without offending the First Amendment. Qualified immunity would therefore attach.").

Viewing the record as a whole, we find that the defendants could have reasonably concluded that firing Díaz-Bigio would not violate her First Amendment rights.[5] Even if their

_____

[5] Díaz-Bigio's complaint also alleged that she was fired because she made public statements about the deaths of patients in the Bariatric Surgery Program of the San Juan Municipal Hospital and these statements led the Health Department of Puerto Rico to initiate an investigation that concluded with the closing of the program. However, Díaz-Bigio presents no argument on appeal that this was the actual reason for her dismissal or a violation of her First Amendment rights, so she has waived the claim.

Even if we were to bypass the waiver, the claim would fail. The evidence produced by Díaz-Bigio shows that she did not make any statements about deaths in the program, and the Health Department of Puerto Rico did not launch its investigation, until after the city investigated her charges against Dr. Escalera, found them false, and provided her with notice of its intent to terminate her employment.

The only earlier statements about the bariatric program in the record were at a February 18 Brotherhood press conference. This press conference did not address the deaths of patients, but rather focused on the different assertion that the bariatric program was contrary to the purposes and financial interests of the hospital. Such accusations are not relevant to Díaz-Bigio's claim. Further, there is little detail in the record about what Díaz-Bigio herself said at this event; the only evidence is her sworn declaration, which says only that she "addressed issues regarding the Bariatric Surgery Program" and "spoke about the contract" establishing the program.

There is nothing in the record that would support a reasonable inference that post-notice-of-dismissal statements about patient deaths were a substantial or motivating cause for Díaz-Bigio's

-25-

"reasoning were mistaken, it would not have been egregiously so and, accordingly, qualified immunity is available." Wagner, 404 F.3d at 509; see also Decotiis, 635 F.3d at 38 (holding that regardless of whether defendant did in fact violate plaintiff's First Amendment rights, which was yet to be determined, defendant was entitled to qualified immunity because a reasonable person in defendant's position could have believed there was no violation).

## III.

We reverse and remand with instructions to the district court to enter summary judgment for defendants in their individual capacities on grounds of qualified immunity.

---

dismissal, or that the reasons stated for her dismissal were a pretext. On the contrary, the evidence is incompatible with such inferences. As the evidence produced does not make out a First Amendment violation, Díaz-Bigio's claim fails on the merits under the first prong of Pearson. Further, under the second prong of Pearson, defendants are entitled to immunity because, on the facts of record, it is clear that reasonable officials, even if aware of her February 18 statements and the time line, would still have thought that firing Díaz-Bigio would not violate the First Amendment.