In the

# United States Court of Appeals

## For the Seventh Circuit

No. 12-2675

BRIAN W. SWETLIK,

*Plaintiff-Appellant*,

*v.*

KEVIN CRAWFORD, Former Mayor,
individually and in his official capac-
ity, *et al.*,

*Defendants-Appellees.*

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 09-C-1157 — **William C. Griesbach**, *Chief Judge.*

ARGUED NOVEMBER 1, 2012 — DECIDED DECEMBER 23, 2013

Before EASTERBROOK, ROVNER, and HAMILTON, *Circuit Judges.*

HAMILTON, *Circuit Judge.* Brian Swetlik is a police detective in Manitowoc, Wisconsin. Swetlik sued the City of Manitowoc, its mayor, and members of its Common Council, alleging that they violated his First Amendment rights by voting to file a termination charge against him with the Manitowoc Police and

Fire Commission. The defendants voted after an outside investigation recommended Swetlik's termination based on its finding that he had been untruthful in statements about the police chief. Swetlik argues that the charges were actually in retaliation for his public criticism of the chief, which he made in his capacity as a union member supporting the union's demands for the chief's resignation. The Police and Fire Commission later dismissed the charges against Swetlik and he was reinstated after a period of paid administrative leave. In the end, it was actually the chief who lost his job.

The district court granted summary judgment for the defendants, finding that Swetlik's statements were not protected speech because they did not address a matter of public concern and, alternatively, that the defendants were justified in bringing the charge against him based on the recommendation of the investigation. We agree with the district court on the second ground and affirm on that basis.

I.  *Factual and Procedural Background*

Because we are reviewing a grant of summary judgment, we must view the evidence in the light reasonably most favorable to Swetlik as the non-moving party, and we must give him the benefit of reasonable inferences in his favor. See *Hanners v. Trent*, 674 F.3d 683, 691 (7th Cir. 2012). In November 2005, the Manitowoc police brought into custody a man suspected of stabbing a police officer. The central controversy in this case begins with an odd incident involving this suspect's custody. The suspect was apparently refusing to eat, and police officers believed he was mentally unstable. For reasons that are unclear, Police Chief Perry Kingsbury arranged for the

suspect's mother to bring him a home-cooked meal at the police station. But the chief's wishes were not relayed to the officers taking the suspect to jail, including Swetlik. Before the home-cooked meal arrived, Swetlik and other officers had already taken the suspect to the county jail for booking. When Chief Kingsbury discovered this, he called the jail and spoke with Swetlik.

This telephone call is at the heart of this dispute. Swetlik said a great deal about this telephone call, both publicly and privately, before he eventually learned that it had been recorded. The actual contents of the conversation are no longer disputed. During the call, Chief Kingsbury explained that he wanted to get the suspect the home-cooked meal, but Swetlik said the jail would not permit outside food. After Kingsbury learned that the suspect's booking process had already begun, the conversation proceeded as follows:

> Chief: Okay. Stop the process, bring him back, we've got some more questions to do.

> Swetlik: Okay. Should I ask him if he wants to—if he wants to, he might not?

> Chief: Well, just—just—why—why can't we just say that hey, we—I'm sorry, we forgot, we've got a few more questions to ask and is there—do you—do you mind coming back over to the department to answer the question?

> [Swetlik then asked the suspect if he wanted to come back to the station for food from his mother; the suspect said he did not want any food; Swetlik got back on the telephone with Chief Kingsbury]

Chief: So you didn't do what I asked you to do. You started talking about the food. What I asked you to do is say hey, you mind coming back over and ask a few questions, we forgot about something. And that's okay, you went about it your way, but—and now he doesn't want anything so just let him get booked—

… Just let him get booked and whatever—whatever happens, happens. Okay?

Swetlik: Okay. He'll—he'll—he'll visit with her later, he just—

Chief: Whatever.

Swetlik: —he don't—he don't want to eat anything.

Chief: Well, I understand that but we—we—we might have been able to get him a meal, okay. But that's okay, we might not have been.

Swetlik: Okay.

Chief: We'll catch ya later.

Swetlik: Okay. Bye.

Swetlik interpreted the chief's words as an instruction to lie to the jailers by telling them that police wanted to question the suspect further. He also misunderstood the chief's final words to be "I will deal with you later" and took them as a threat. Swetlik was upset. He told the police officers who were with him that Chief Kingsbury had told him to lie and had threatened him for not doing so. Later that day he reported the same

to a deputy chief of police, who apparently took no action on Swetlik's complaint.

Swetlik was not the only one who had complaints about Chief Kingsbury. The police union took a vote of no confidence in Kingsbury in early 2006 and compiled a list of grievances against him and the general operation of the police department with regard to public safety and department morale. Swetlik added this grievance to the list:

> Chief has told officers to lie to other agencies (Golden Attack)[.] A suspect was taken to MTSO after the stabbing [of] an officer and while being booked in called an officer and told him to bring the suspect back to the PD for a homecooked meal from the suspect[']s mother. When the officer asked what he was suppose[d] to tell the jail staff the chief told him to lie and say there were more questions to be asked. The officer refused and the chief said, "I will deal with you later[.]" Nothing was done.

The union marched to city hall to present its list of 37 grievances and to demand the resignation of Chief Kingsbury. They presented the grievances and demand to the mayor, the Common Council, and members of the Police and Fire Commission. Kingsbury responded by arranging a mediation session between the union and one of his deputies. After mediation failed, Kingsbury sought to have an outside investigation into the veracity of the union's complaints. He and his private attorney discussed the possibility with the mayor, and the three agreed that an investigation for the purpose of getting "to the heart of the complaints from the view of an outside

investigator" would be appropriate. Kingsbury sent a letter to the mayor formally requesting an investigation into the union's complaints against him and the department. The mayor agreed and the city attorney hired an outside investigator, the law firm of DeWitt Ross & Stevens, S.C.[1]

In authorizing the investigation, the mayor explained that its purpose was to "bring this long-debated issue in our community to a close" by investigating the "alleged complaints and accusations against Chief Perry Kingsbury and his administration, and all related issues and incidents." Swetlik maintains that the purpose of the investigation was to silence the union, pointing to statements by the private attorney who represented Chief Kingsbury throughout the investigation. The attorney told the investigators: "When you have got that much [union] noise going on, you can't be bopping everybody. He [the Chief] wouldn't have a department. Which one, who, and how? Part of the reason you guys are in here is to help us sort out [who's] on first, second, and third. It's hard enough just running the PD let alone trying to figure out all this intrigue." The chief's attorney also told the investigators that Swetlik exemplified the union's agenda and that he had a "poisoned" attitude.

Over the next year, the law firm conducted more than 80 interviews. Swetlik was interviewed three times about the

---

[1] The evidence indicates that the city selected this firm on the recommendation of the chief's private attorney, who recommended a specific senior partner at the firm. That partner was not involved in the investigation. Swetlik does not dispute that the chief's private attorney served as only his private attorney.

telephone call and his allegations that Chief Kingsbury threatened him for not following his instructions to lie to the jailers. Before his interviews, though, he had listened to the recording of the conversation. During his first interview, Swetlik conceded that Chief Kingsbury did not actually say the words that he had earlier claimed were a threat ("I will deal with you later"). Still, Swetlik maintained that Kingsbury had directed him to lie to the jailers rather than to the suspect. (The assumption shared by all parties is that deception of suspects is an accepted part of interrogation, but that law enforcement officers must be honest with each other.)

The investigators' report ultimately recommended to the mayor and the council that both Swetlik *and* Chief Kingsbury be terminated (as well as another officer). With regard to Kingsbury, the report addressed over a dozen allegations against him and found that most were valid. Based on those findings, it recommended that Kingsbury be removed for "inefficiency," "official misconduct," and "malfeasance in office." With regard to Swetlik, the report recommended termination because he had lied about the telephone call with Kingsbury, and lying violated a department rule. The report said:

> [T]here is no doubt that [Swetlik] lied to other officers about the Chief allegedly instructing him to lie to the sheriff's department deputies and threatening him for failing to do so. Perhaps more importantly, however, is that Detective Sergeant Swetlik allowed those lies to be perpetuated and brought forth to the Police and Fire Commission, the Common Council and this investigation in an effort to

seek the removal of Chief Kingsbury. It was only after he learned that the entire conversation was recorded and he obtained a copy through the open records process, that he was forced to retract a part of the allegations. Nonetheless, Swetlik still clung to the allegation that the Chief instructed him to lie to the Sheriff's deputies despite clear and convincing evidence to the contrary contained on the recording.

The investigators presented the report and recommendations to the Common Council. The council voted unanimously to adopt the recommendation to bring termination charges against both Kingsbury and Swetlik. After this vote, the investigators were told to prepare formal charges. The investigators presented Swetlik's formal charge statement to the Common Council at a second council meeting on November 5, 2007. A majority of the council, including the mayor, voted to file the charges.

In the end, two aldermen, Brey and Tittl, did not agree to file any of the charges, though they had initially voted in favor. Alderman Brey later testified:

> As time went on as you reread the report from DeWitt, Ross & Stevens, and even in my own—this is my recollection, the more you read it, the more to me it became frivolous … . When we start attacking people's characters for little inciden[ts] that seem to be irrelevant to the big thing, I just thought this became a witch hunt.

Brey clarified that by "witch hunt" he meant that the concerns brought to the Common Council by the union

members were the main "focus of this investigation by DeWitt, Ross & Stevens." He did not sign the charges because, "after rereading and rereading the report, I determined that the allegations were just that. Lot of them were allegations and not based on fact or violations of law."

Alderman Tittl later testified that he thought the charge against Swetlik was "ridiculous" and "felt that the Chief trying to get this guy a home cooked meal and the detective trying to keep the guy in jail, and I guess I made an assumption that he felt threatened and I didn't think it warranted removal from the department."

After the Common Council voted to pursue the charge, Swetlik was placed on paid administrative leave pending the outcome. Swetlik's case was presented to a hearing officer of the Police and Fire Commission on February 27 and 28, 2008. Upon Swetlik's motion, the hearing officer recommended dismissal of the charge. He concluded that Chief Kingsbury's statements to Swetlik during their telephone conversation could have been interpreted as instructing him to tell the jailers, not the suspect, that police had additional questions for the suspect even though they did not. The hearing officer also concluded that the chief's statements could have been perceived as threatening. Swetlik was reinstated with the police department after the Commission adopted the hearing officer's conclusions. Swetlik then brought this suit in federal court against the mayor and the individual members of the Common Council who voted to bring the charges. He claimed they retaliated against him in violation of the First Amendment by bringing charges against him for his complaints about Chief Kingsbury, which were protected speech because he raised

them as part of his union activities. The district court granted summary judgment for the defendants, and Swetlik appeals.

## II. *Absolute Immunity*

Defendants raise a threshold defense to the entire case, arguing they are entitled to absolute prosecutorial immunity. We reject this defense. Prosecutorial immunity applies to prosecutorial actions that are "intimately associated with the judicial phase of the criminal process." *Van de Kamp v. Goldstein*, 555 U.S. 335, 341 (2009), quoting *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). The defendants here are not prosecutors, of course, but that is not why the defense fails. The immunity's application depends not on an official's title but on whether the official is, at the time, "acting as an officer of the court" and on the action's "relatedness to the judicial phase of the criminal process." *Fields v. Wharrie*, 672 F.3d 505, 510 (7th Cir. 2012); see also *Wilson v. Kelkhoff*, 86 F.3d 1438, 1443 (7th Cir. 1996) ("Absolute immunity is not limited to government officials with the title of prosecutor or judge; officials performing 'functionally comparable' acts in other contexts, such as administrative agencies, are also accorded absolute immunity.").

Absolute immunity is not available here because the defendants' action was an employment decision, not a decision to bring criminal charges. Defendants have not provided and we have not found any cases extending prosecutorial immunity to an employment decision. Even prosecutors themselves are not entitled to absolute immunity when they make employment decisions. See, *e.g.*, *Lacey v. Maricopa County*, 693 F.3d 896, 930–31 (9th Cir. 2012) (en banc) ("Decisions related to general

conditions of employment—including decisions to hire, promote, transfer, and terminate—and which do not affect the prosecutor's role in any particular matter are generally not sufficiently related to the initiation and conduct of a prosecution in a court of law or their role as an advocate of the state to qualify for absolute immunity."); see also *Forrester v. White*, 484 U.S. 219, 229 (1988) (state judge "was acting in an administrative capacity when he demoted and discharged" a probation officer and therefore was not entitled to absolute immunity). To argue for a different result, defendants point only to our decision in *Henry v. Farmer City State Bank*, 808 F.2d 1228, 1238 (7th Cir. 1986), but the prosecutorial immunity we extended to the state's attorney there was for the attorney's actions in filing a petition for civil contempt. The case does not support prosecutorial immunity for a decision to bring termination charges against an employee.

III.   *First Amendment Retaliation*

We turn to the merits. To establish a claim for retaliation in violation of the First Amendment, a public employee must prove that: (1) his speech was constitutionally protected, (2) he has suffered a deprivation likely to deter speech, and (3) his speech was at least a motivating factor in the employer's action. *Peele v. Burch*, 722 F.3d 956, 959 (7th Cir. 2013). Only the first element is disputed in this case.[2]

---

[2] Because the second element is not disputed here, we assume without deciding that the defendants' actions in bringing formal, public charges that (a) caused plaintiff's immediate suspension with pay and (b) could have led to his termination were sufficient to deter protected speech. In public

(continued...)

For a public employee's speech to be protected under the First Amendment, the employee must show that (1) he made the speech as a private citizen, (2) the speech addressed a matter of public concern, and (3) his interest in expressing that speech was not outweighed by the state's interests as an employer in "promoting effective and efficient public service." *Houskins v. Sheahan*, 549 F.3d 480, 490 (7th Cir. 2008). This last element is known as *Pickering* balancing, after *Pickering v. Board of Education*, 391 U.S. 563 (1968). Under *Pickering* and its progeny, if an employer takes action against an employee for

---

[2] (...continued)
employees' First Amendment cases, we have recognized that the question is often fact-specific and that sometimes even modest deprivations or threats can be sufficient to deter protected speech. See, *e.g.*, *Spiegla v. Hull*, 371 F.3d 928, 941 (7th Cir. 2004) (unwelcome transfer to more demanding job duties); *Power v. Summers*, 226 F.3d 815, 820 (7th Cir. 2000) (harassment and ridicule); *Pieczynski v. Duffy*, 875 F.2d 1331, 1333 (7th Cir. 1989) (harassment of public employee for political beliefs violates First Amendment unless the harassment is so trivial that a person of ordinary firmness would not be deterred from holding or expressing beliefs); see generally *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 76 n.8 (1990) ("the First Amendment … already protects state employees not only from patronage dismissals but also from 'even an act of retaliation as trivial as failing to hold a birthday party for a public employee … when intended to punish her for exercising her free speech rights'"), quoting *Rutan v. Republican Party of Illinois*, 868 F.2d 943, 954 n.4 (7th Cir. 1989). Judge Easterbrook's concurring opinion shows that this line of First Amendment cases is in tension with First Amendment doctrine under the *Noerr-Pennington* doctrine as it might be applied to the rights of individual government officials who take action against a public employee based on his protected speech. We leave these interesting questions of conflicting First Amendment rights for another day where they may affect the outcome of the case.

speech that the employer, based on an adequate investigation, reasonably believes to be false, the employer's interests outweigh the speaker's interests. See *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1500, 1505–06 (7th Cir. 1994).

Applying these legal principles, we review *de novo* the district court's grant of summary judgment. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1176 (7th Cir. 2013). We will affirm the grant of summary judgment if, viewing the facts in the light reasonably most favorable to Swetlik, there is no genuine dispute as to any material fact. *Id.*; Fed. R. Civ. P. 56(a). A genuine issue of material fact exists only if there is enough evidence upon which a reasonable jury could return a verdict in Swetlik's favor. *Cloe*, 712 F.3d at 1176. Viewing the facts in this light, we find that Swetlik could be deemed to have spoken as a private citizen about a matter of public concern when he made statements about Chief Kingsbury as part of his union activities. We also find, however, that undisputed facts show that the defendants reasonably relied on the investigation's report that Swetlik had been untruthful, and thus they were justified in bringing termination charges against him based on those statements.

A.  *Speaking as Private Citizen*

Defendants argue first that Swetlik's statements are not entitled to the protection of the First Amendment because he did not speak as a private citizen. They argue that the comments leading to the alleged retaliation were made pursuant to Swetlik's official duties and therefore were not protected by the First Amendment. See *Garcetti v. Ceballos*. 547 U.S. 410,

421–22 (2006) (a public employee's statements made pursuant to official duties are not made as a private citizen for the purposes of the First Amendment); see also *Vose v. Kliment*, 506 F.3d 565, 569 (7th Cir. 2007) (applying *Garcetti*). According to defendants, because Swetlik was claiming the chief had violated department policy by ordering him to lie to the jailers, Swetlik was required to report the telephone call to his superiors. On this theory, when Swetlik gave his version of the call to the deputy chief and to the investigators, he acted pursuant to his official duties.

If the only basis for the defendants' taking action against Swetlik were statements he had made as part of his official duties, *Garcetti* would indeed bar the claim, and we assume for purposes of argument that the defense theory would apply to to Swetlik's statements to the deputy chief and investigators. But Swetlik has also offered evidence that defendants were acting on the basis of his other statements on the matter, including the grievances that the union presented to the Common Council and the Police and Fire Commission. Those statements were made in his capacity as a union member, not as part of his official duties as a police detective. See *Nagle v. Village of Calumet Park*, 554 F.3d 1106, 1123–24 (7th Cir. 2009) (police officer's statements made at a union meeting were made in his capacity as a union representative, not as a police officer, but summary judgment for employer was affirmed because statements did not address matter of public concern). Thus, with regard to his statements at the union meeting and in the list of grievances, *Garcetti* "does not deprive his comments of First Amendment protection." *Id*. at 1123; see also *Morales v. Jones*, 494 F.3d 590, 597–98 (7th Cir. 2007) (applying

*Garcetti* and reversing for new trial because police officer's speech to district attorney was not protected, while same speech made in a deposition was protected).

B. *Matter of Public Concern*

The district court did not decide whether *Garcetti* applied. The court found that Swetlik's speech was not protected because it did not address a matter of public concern. We disagree. Swetlik's allegations about Chief Kingsbury implicated the effectiveness and integrity of the chief, specifically with regard to his handling of police procedures such as transporting and booking suspects (in this case, a suspect who had stabbed a police officer), and we have observed that "'[i]t would be difficult to find a matter of greater public concern … than police protection and public safety,'" *Gustafson v. Jones*, 290 F.3d 895, 907 (7th Cir. 2002) (affirming denial of new trial after jury verdict for officers who had publicly criticized a department order limiting follow-up investigations), quoting *Auriemma v. Rice*, 910 F.2d 1449, 1460 (7th Cir. 1990) (en banc).

This case differs from those in which we have previously found speech not to address a matter of public concern because it was purely personal or vindicated only a personal interest. See *Bivens v. Trent*, 591 F.3d 555, 561–62 (7th Cir. 2010) (employee's complaints about lead poisoning were confined to his own illness); *Milwaukee Deputy Sheriff's Ass'n v. Clarke*, 574 F.3d 370, 379 (7th Cir. 2009) (deputy sought to further his own personal interest by questioning sheriff's courage); *Kokkinis v. Ivkovich*, 185 F.3d 840, 844–45 (7th Cir. 1999) (officer's concerns about the chief's "vindictiveness" were expressed to further officer's personal goals). Swetlik's accusation that Chief

Kingsbury directed an officer to "lie to other agencies" was a serious accusation that implicated the chief's integrity and ability to fulfill his duties as the head of the police department. Moreover, Swetlik raised the concern along with the other concerns raised by union members to bring public attention to the problems they perceived in the department, which they did by bringing the grievances to the mayor, the Common Council, and the Police and Fire Commission. Swetlik's speech was a matter of public concern in at least some of the contexts in which it was raised, so summary judgment cannot be affirmed on this basis.

C.  *Pickering Balancing*

Although for purposes of summary judgment Swetlik's statements about Chief Kingsbury were made as a citizen and addressed a matter of public concern, for speech to be protected under the First Amendment, it must satisfy another requirement: the employee's interest in making the speech must outweigh the employer's interest in "promoting the efficiency of the public services it performs through its employees." *Hernandez v. Cook County Sheriff's Office*, 634 F.3d 906, 914 (7th Cir. 2011) (internal quotations omitted), citing *Pickering*, 391 U.S. 563. If not, the employer's action is considered to be justified and does not violate the First Amendment. See *Garcetti*, 547 U.S. at 418 ("The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public."), citing *Pickering*, 391 U.S. at 568. The Court in *Pickering* suggested that an employee's statements may fail the test and not warrant protection if they were false and made with knowing or reckless disregard for the truth, *Pickering*,

391 U.S. at 574, and we have since held that "an employee's speech is not protected where it is[] made with a reckless disregard for the truth …," *Brenner v. Brown*, 36 F.3d 18, 20–21 (7th Cir. 1994).

Whether an employee recklessly disregarded the truth in making a statement will often present a disputed factual issue. An employer cannot avoid liability for First Amendment retaliation simply by asserting that an employee's otherwise protected speech was false or was made recklessly. See *McGreal v. Ostrov*, 368 F.3d 657, 673–74 (7th Cir. 2004) (reversing summary judgment for employers where they presented no evidence on the truth of employee's statements or their reason for believing statements to be false). But an employer may defeat a First Amendment retaliation claim if "supervisors reasonably believed, after an adequate investigation, that [the employee's] testimony was false, even if it actually was true." *Wright v. Illinois Dep't of Children & Family Servs.*, 40 F.3d 1492, 1506 (7th Cir. 1994), citing *Waters v. Churchill*, 511 U.S. 661, 677–80 (1994) (plurality opinion); see also *Waters*, 511 U.S. at 685 (Souter, J., concurring) (reasonableness test in plurality opinion was approved by majority of Court and represents a holding).[3]

---

[3] Our approach to the problem is consistent with that of other circuits, which generally hold that a public employee's speech is not entitled to First Amendment protection when the employer shows that the speech was false or made with reckless disregard for the truth, particularly when the truth of the statement was thoroughly investigated. See, *e.g.*, *Diaz-Bigio v. Santini*, 652 F.3d 45, 54 (1st Cir. 2011) (reversing denial of qualified immunity to employer on summary judgment where city took employee's criticisms

(continued…)

The defendants in this case are not entitled to summary judgment on the theory that a reasonable jury would be required to find that Swetlik's statements were deliberate lies or were made with reckless disregard for the truth. The Police and Fire Commission's hearing officer found that Swetlik could have been stating his own reasonable interpretation of Chief Kingsbury's statements rather than lying. That is a plausible reading of the evidence, even if it is not the strongest reading. We must determine, then, whether the defendants voted to bring termination charges against Swetlik because they genuinely and reasonably believed, based on an adequate investigation, that Swetlik had lied about his telephone

---

[3] (...continued)

"seriously and investigated them, basing its termination decision on the fact that they were found false and groundless"); *Brewster v. Board of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 981–82 (9th Cir. 1998) (reversing denial of qualified immunity for employer on summary judgment; falsity of employee's speech was part of *Pickering* balancing, and the "fact that, despite their public-concern character, [teacher's] allegations of erroneous recordkeeping were ultimately determined to be false, both by [the principal] and by a team of independent auditors," weighed against First Amendment protection); see also *Reuland v. Hynes*, 460 F.3d 409, 414–15 (2d Cir. 2006) (speech not entitled to First Amendment protection if employer shows the statement: "(1) would reasonably have been perceived as an assertion of fact, (2) was false, and (3) was made with knowledge or reckless disregard of its falsity," but affirming denial of directed verdict for defendants where nothing in the record suggested plaintiff's statement was false); cf. *Westmoreland v. Sutherland*, 662 F.3d 714, 721–23 (6th Cir. 2011) statements made "with knowledge of, or reckless indifference to, their falsity" are not a matter of public concern such that *Pickering* balancing is not necessary; reversing grant of summary judgment for employer where fact issue existed as to whether plaintiff made statements recklessly).

conversation with Kingsbury. See *Waters*, 511 U.S. at 677–80 (plurality opinion). If so, they were justified in bringing the termination charges.

To show that the defendants did not believe he had lied but instead voted for the termination charges to silence his legitimate complaints about the chief, Swetlik relies heavily on the chief's private attorney's statements that the purpose of the investigation was to quell the union's complaints about Kingsbury. The problem is that Swetlik has presented no evidence that the private attorney caused any improper bias on the part of the investigators or that the defendants shared his views. And the fact that the investigation recommended the termination of Chief Kingsbury himself undermines Swetlik's claim that its secret purpose was to protect the chief, distinguishing this case from *Hobgood v. Illinois Gaming Bd.*, 731 F.3d 635 (7th Cir. 2013), where the plaintiff presented evidence that the internal agency investigation that ultimately resulted in a decision to terminate his employment had a predetermined outcome. See *id*. at 644–45.

Similarly unconvincing is Swetlik's argument that the mayor's testimony shows that the mayor did not believe he had lied but instead wanted to retaliate against him for his union activities. Swetlik points to the mayor's statement that he signed the charges because he believed it would remedy that "constant issues of communication between administration and the floor," but the inference Swetlik draws from those words is unreasonable and ignores the mayor's additional testimony that he voted for the charges because he "believed that the charges were valid and so the action … would help resolve issues at the police department." We must assume the

truth of the non-moving party's evidence on summary judgment, but that duty "does not extend to drawing inferences that are supported by only speculation or conjecture." *Cloe*, 712 F.3d at 1176 (internal quotations omitted).

Nor has Swetlik presented evidence from which a jury could reasonably conclude that the defendants' acceptance of the investigators' findings was unreasonable. His best evidence on this question comes from the two aldermen who voted against the termination charges. Alderman Brey found the allegations against Swetlik to be unsupported and thought the investigation's focus on the union's complaints qualified as a "witch hunt." Alderman Tittl thought that Swetlik was right to complain about Chief Kingsbury's behavior. But the fact that these two aldermen were not persuaded by the report would not permit a jury to conclude that their colleagues who were sued did not reasonably believe that Swetlik had lied about police matters and that he should be fired on that basis. See *Waters*, 511 U.S. at 678 (plurality opinion) ("[T]here will often be situations in which reasonable employers would disagree about who is to be believed, or how much investigation needs to be done," and "[i]n those situations, many different courses of action will necessarily be reasonable"). To the contrary, the undisputed evidence shows that the defendants were advised to have no contact with the department during the investigation, and that they first heard from the investigators when the report was presented. The discrepancies between Swetlik's account of his conversation with Kingsbury and the recording of that conversation provide further support for the defendants. A jury could not find that the defendants' belief that he had lied was unreasonable.

The undisputed evidence thus shows that the defendants were justified in bringing termination charges against Swetlik on the basis of the investigation report. His First Amendment claim must therefore fail. Presented with the supported findings of an outside investigation that Swetlik violated department policy by making untruthful statements, defendants could reasonably rely on the report in voting to bring termination charges. In other words, the defendants' interest in ensuring the proper functioning of the department outweighed Swetlik's interest in making his statements about Kingsbury. Because we affirm on the merits, we do not reach the defense of qualified immunity.

The judgment of the district court is AFFIRMED.

EASTERBROOK, *Circuit Judge*, concurring. The mayor and legislature of a city in Wisconsin proposed to discharge two members of the police department, which was experiencing internal discord. Under state law, the power to discharge rests with the Police and Fire Commission. So the elected officials put their case to the Commission, which took evidence, deliberated, and concluded that Detective Kevin Swetlik should keep his job, but that Perry Kingsbury, the Chief of Police, should be sacked. You might expect a suit by Kingsbury, demanding his job back and his name cleared. Instead we have a suit by Swetlik, who contends that even *proposing* to fire him is actionable under 42 U.S.C. §1983 as an infringement of his freedom of speech.

Today the court holds that the filing of charges was justified. Because we rule against Swetlik on this ground, with which I agree, the court does not consider other subjects—including the fact that elected officials have a constitutional right to speak and petition. Swetlik relies on cases holding that public officials cannot fire or discipline employees on the basis of protected speech. But defendants did not fire Swetlik; they made a proposal to the Commission. In other words, defendants engaged in speech rather than action. Elected officials often express opinions about who should work for the polity. Views about how best to run the government are not confined to editorial writers or politicians seeking office; those already in office also have opinions and may have extra knowledge on which to base them. And if each elected official has a right to express an opinion, then defendants no less than Swetlik are protected by the first amendment from penalties for their speech.

The court mentions this possibility at pages 11–12 note 2 but leaves the matter for decision another day. Seems to me that the answer is straightforward. First, elected officials (defendants, for example) have the same first amendment rights as appointed ones (Swetlik, for example). Second, everyone has the right to petition for redress of grievances—and that's what defendants did, petitioning the Commission to remove employees who in defendants' view were harming the public weal. Third, under the *Noerr-Pennington* doctrine petitions to public bodies cannot be penalized unless they are frivolous. See *BE&K Construction Co. v. NLRB*, 536 U.S. 516 (2002) (recapitulating the *Noerr-Pennington* doctrine).

We held in *New West, LP v. Joliet*, 491 F.3d 717, 721–22 (7th Cir. 2007), that the *Noerr-Pennington* doctrine applies to speech, proposals, and petitions by elected officials. Other circuits agree. See *Miracle Mile Associates v. Rochester*, 617 F.2d 18 (2d Cir. 1980); *Mariana v. Fisher*, 338 F.3d 189 (3d Cir. 2003); *Manistee Town Center v. Glendale*, 227 F.3d 1090 (9th Cir. 2000). A solitary decision, *Video International Production, Inc. v. Warner-Amex Cable Communications, Inc.*, 858 F.2d 1075 (5th Cir. 1988), is to the contrary. Yet the only reason given in *Video International*—that "it is impossible for the government to petition itself within the meaning of the first amendment", *id.* at 1086—not only wrongly supposes that "the government" is a unitary entity (Swetlik's situation and *Virginia Office for Protection & Advocacy v. Stewart*, 131 S. Ct. 1632 (2011), show that it isn't), but also overlooks the fact that defendants in suits of this kind are real people in their personal capacities, not "the government".

The *Noerr-Pennington* doctrine establishes that Swetlik cannot collect damages under §1983 for defendants' pro-

posal to fire him. Even if the charges defendants made against Swetlik were false and libelous, that would not matter, because *Paul v. Davis*, 424 U.S. 693 (1976), holds that defamation that does not make a person unemployable does not violate the Constitution.

Otherwise we would open a new era in which litigants who prevail before state courts or administrative agencies could turn around and demand damages in federal court. If fee-shifting is to occur at all, this should be done in the original state proceeding, not in a separate federal suit. Under the American Rule, litigants must bear their own legal expenses in the absence of a statute requiring losers to pay. Swetlik does not contend that Illinois law entitles him to compensation for the costs incurred in defeating defendants' proposal; he didn't even seek such an award in the state proceeding. Maybe he was represented by a union and did not incur any legal expenses. Yet he sees in the first amendment an entitlement to collect from his adversary via a second, federal proceeding. It just isn't there.